**SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, Plaintiff,**

v.

**DELHI GAS PIPELINE CORPORATION, Defendant.**

**Civ. A. No. H74-46(R).**

United States District Court,
S. D. Mississippi,
Hattiesburg Division.

Aug. 4, 1977.

John K. Keyes, Collins, Miss., for plaintiff.

Walker L. Watters, Jackson, Miss., Moran M. Pope, Jr., Hattiesburg, Miss. and W. S. Barron, Jr., Dallas, Tex., for defendant.

OPINION

DAN M. RUSSELL, Jr., Chief Judge.

South Mississippi Electric Power Association (SMEPA), a Mississippi non-profit corporation headquartered at Hattiesburg, Mississippi, initially sued Delhi Gas Pipeline Corporation, (Delhi) a Delaware corporation domiciled at Dallas, Texas, in the Chancery Court of Forrest County, Mississippi, for specific performance and damages. Delhi removed the action to this Court on the grounds of diversity of citizenship, and both parties have agreed that this Court has jurisdiction. The cause was tried to the Court without a jury.

SMEPA is engaged in the generation and transmission of electricity for sale at wholesale to its distribution members consisting of electric power associations in several localities in the southeastern part of Mississippi. SMEPA owns three electric generating plants, only two of which are involved herein, its main plant at Moselle in Jones County, and a smaller gas turbine plant moved from Sylvarena, to Paulding in Jasper County, and which is approximately forty miles from the Moselle plant. SMEPA's primary source of fuel for its generating plants is natural gas, with fuel oil being utilized as an alternate source. The chief function of Delhi, a wholly owned subsidiary of Texas Oil and Gas Corporation, Dallas, is to operate gas gathering systems in a number of southwestern states and also in Mississippi. One of these systems is known as Delhi's "Harmony Gas Gathering System" located in the counties of Jasper, Clarke and Wayne. The defendant purchases residue gas from oil fields in the area, places such gas in its gathering system, processes it at what is known as Delhi's Harmony Processing Plant, and sells the gas to customers such as SMEPA.

Having reviewed the evidence both as to documentation and live testimony, the Court chronicles the events leading up to the contractual dispute giving rise to this litigation, noting that SMEPA no longer seeks specific performance but damages against Delhi for the alleged breach of its contractual obligations.

In December 1970, George B. Taylor, general manager of SMEPA, contacted T. E. Lohman, a vice-president of Delhi seeking a source of gas for SMEPA's turbine plant to be relocated at Paulding, some fifteen miles from Delhi's Harmony plant. Following approval by SMEPA's Board of Directors to relocate the turbine plant at Paulding near Delhi's gathering system, negotiations culminated in a six-months' gas purchase contract dated June 16, 1971, between Delhi and SMEPA whereby Delhi agreed to make its reserves in the West Paulding Field available to SMEPA for 27¢ per MMBTU (one million British Thermal Units), providing SMEPA would agree to take up to 3500 MCFD (one thousand cubic feet daily). Unavailability of reserves prevented the delivery of any gas under this contract.

Negotiations began again in April 1972 resulting in a gas sales contract, dated May 17, 1972 between Delhi and SMEPA, whereby for a term of eighteen months beginning August 1, 1972 and ending January 31, 1974, Delhi obligated itself to make a quantity of gas available to SMEPA of up to 6,500 MCFD, the full capacity of SMEPA's Paulding plant, SMEPA to have the right to very its purchases of gas from day to day from a minimum of zero MCF each day to a maximum of 6,500 MCF each day. In turn, Delhi agreed to take and pay for a contract quantity [1] equal to 4000 MCFD. The price to be paid by SMEPA for all gas delivered to it or that SMEPA was obligated to pay for whether taken or not was 53½¢ per MMBTU. Delhi agreed to construct and maintain all facilities necessary to deliver the gas to SMEPA's Paulding plant at a pressure of not less than 250 psig (pounds per square inch, gauge). Although not so identified in the contract, the parties do not dispute that the gas to be supplied to SMEPA by Delhi was being supplied by virtue of a "Residue Gas Purchase Agreement",

---

1. In variously defined terms in the contract, "contract quantity" is stated to mean the quantity of gas each month that the buyer is required to take and pay for, or nevertheless pay for if available and not taken under the provisions of the contract.

dated June 9, 1972, between Delhi and Texas Pacific Oil Co., Inc., from the latter's Lake Como Field, Jasper County, about eight miles southwest of SMEPA's Paulding plant, this gas being designated herein as TP gas. The contract was for a period of eighteen months from the first delivery date. Texas Pacific made all its residue gas available with Delhi agreeing to take delivery at its Harmony plant of up to a maximum of 10,000 MCFD for 38¢ per MMBTU. Both parties undertook performance of the contract.

It is undisputed that SMEPA was seeking the purchase of additional amounts of gas in sufficient quantities, at least 10,000 MCFD, over a period of time that would justify SMEPA's construction of its own pipeline between its Paulding and Moselle generating plants, and that Delhi desired to be SMEPA's supplier.[2] These goals were established at a conference on March 29, 1973, in Jackson, Mississippi between Taylor and Lohman, also attended by Howard Berry, a pipeline contractor. In furtherance of same, Lohman, on behalf of Delhi, forwarded a proposed letter amendment, dated May 18, 1973, to Taylor of SMEPA to implement a verbal agreement for Delhi to supply SMEPA with a new source of gas obtained by Delhi by virtue of a gas purchase agreement, dated April 6, 1973, between Delhi and Petro Grande, Inc., and others, this gas originating from the McNeil Field in Jasper County, about five miles from Paulding, and being referred to herein as Petro Grande gas. The Delhi-Petro Grande contract was for a ten year term, effective 30 days after receipt of the agreement by Delhi, and obligated Delhi to take up to a maximum of 5000 MCFD at initial delivery. It further provided for a price redetermination from the contract price of 47¢ per MMBTU if deliveries reached a total of 2000 MCFD at the end of the first year, and, if not, a price redetermination at the end of two years. According to Lohman the total gas from both sources, Texas Pacific and Petro Grande, did not initially amount to 10,000 MCFD.

In Lohman's proposed letter agreement of May 18, 1973, Delhi would have deleted Section 7.1 of Article VII pertaining to "Price and Billing", and substituted the following:

"The price to be paid by Buyer to Seller for all gas delivered to Buyer hereunder, or that Buyer is obligated to pay for whether taken or not shall be fifty three and one-half cents (53½¢) per MMBTU; provided, however, as to the first two thousand (2000) MCF per day or part thereof delivered to Buyer which is attributable to that certain Gas Purchase Agreement dated April 6, 1973, between Seller hereunder and Petro Grande Incorporated, et al the price shall be sixty-two and one-half cents (62½¢) per MMBTU. Seller shall furnish Buyer with an allocation statement each month showing the volumes of gas delivered to Buyer attributable to said Petro Grande Gas Purchase Agreement."

The succeeding paragraph in the proposal otherwise provided for the gas sales agreement of May 17, 1972 between Delhi and SMEPA to remain in full force and effect.

Taylor testified that this proposal was not acceptable to SMEPA as it did not obligate Delhi to make the Petro Grande gas available for the extended period.

On June 1, 1973, in a letter from R. Norman Bailey, SMEPA's manager of production, to Lohman, Bailey noted that there appeared to be a misunderstanding as to SMEPA's right to the Petro Grande gas for a ten year period. He requested two changes, (1) correction of SMEPA's name from that which appeared in Lohman's proposal, and (2), the following insertion as Item 2:

"All gas obtained by Delhi Gas Pipeline Corporation (the Seller) from Petro Grande, Inc., et al shall be made available to South Mississippi Electric Power Association (the Buyer) for the term of the existing sales contract, subject to price and terms agreeable to the Buyer, and

---

2. According to SMEPA it had in early 1973 sustained a serious curtailment of its gas sup-

ply to the Moselle plant, obtained from an interstate supplier.

for an additional term which when added to the remaining term of the existing contract will equal 10 years."

Under a cover letter of June 11, 1973, Delhi forwarded a letter agreement, dated June 7, 1973, to Bailey containing the substituted Section 7.1 under Article VII, Price and Billing, with SMEPA's corrected name, adding Item 2 as proposed by Bailey, except for providing "subject to price and terms mutually agreeable to the Seller and the Buyer", and again providing that, except as herein amended, said Gas Sales Contract dated May 17, 1972, would remain in full force and effect. (Underscoring added). This letter agreement was accepted by SMEPA on June 20, 1973. In the cover letter to Bailey, Lohman said: "In paragraph 2 I have indicated our willingness to negotiate with you for the extension of the term during which this gas would be available to you. It is, of course, subject to our mutually agreeing upon the price and terms to be included in the contract."

Delhi promptly initiated negotiations with Texas Pacific to secure an extension of Delhi's eighteen month gas purchase agreement with Texas Pacific and was successful on August 24, 1973. By a letter agreement of that date, the term of the initial agreement was extended to September 1, 1983, and month to month thereafter until either party terminated by giving the other party ninety days prior written notice. In order to get the extension, Delhi agreed to an increase in price from 38¢ per MMBTU to 56½¢ per MMBTU, effective September 1, 1973, with a 1¢ annual increase per MMBTU each September 1, thereafter; also, effective September 1, 1974 and each September 1, thereafter, the contract provided for a redetermination of price based on the highest price then being paid for gas of like quantity and quality in Jasper, Wayne and Clarke Counties.

On August 29, 1973, Lohman met with Taylor and Bailey in Hattiesburg for the purpose of SMEPA's acquiring from Delhi the TP gas on a long term basis and to resolve the "price and terms" left open by the June 7, 1973 letter amendment. In a letter of the same date from Lohman to Bailey, Lohman felt it desirable to summarize the morning decision. In this letter he stated that it would be necessary to pass on to SMEPA the 18½¢ per MMBTU increase that Texas Pacific required of Delhi for a price of 72¢ per MMBTU, effective September 1, 1973, with the same annual escalation of 1¢ per MMBTU each September 1, thereafter, and for a price redetermination each year based on the highest price paid for gas of like quantity and quality in Jasper, Wayne and Clarke Counties. He said an agreement would be necessary for Delhi to purchase gas for SMEPA in Jasper, Clarke and Wayne Counties for sale to SMEPA at Delhi's residue gas cost plus 15.5¢ per MMBTU, saying this would give Delhi an area of interest near the end of SMEPA's proposed pipeline from its Moselle plant to its Paulding plant, encompassing the area in which Delhi's gathering system is located. He mentioned the possibility of SMEPA's exchanging fuel oil in lieu of paying for the gas. He indicated the desirability of changing the delivery point from SMEPA's Paulding generating station to Delhi's Harmony gas processing plant. In order to do this, Lohman suggested that Delhi construct a 6″ gas pipeline between the two points, for an approximate cost of $500,000.00, to sell to SMEPA at cost, with Delhi retaining the right to use some of the capacity of the pipeline to provide fuel for Delhi's facilities along the route of the pipeline in conjunction with which Delhi would provide operating personnel and maintenance for the pipeline and reduce the price of gas to SMEPA in the area of 2½ to 4¢ per MCF. Lohman also noted that if the pipeline was built from Paulding to Delhi's Harmony plant, Delhi would also be in a position to dedicate to SMEPA other gas purchase contracts, which were currently undedicated, as well as sell SMEPA an ethane product that could be produced at the Harmony plant and sold as a commingled product with gas. Based on current gas rates, Lohman said this would mean approximately 10,000 MCFD would be available to SMEPA, adding that it would be Delhi's obligation to deliver whatever quantity was available.

As both the plaintiff and the Court note, nowhere in Lohman's letter of August 29, 1973, does Lohman comment on Delhi's obligation to deliver Petro Grande gas for the contemplated extended period. Taylor, on behalf of SMEPA stated that the quantity of the Petro Grande gas was never at issue inasmuch as the June 7, 1973 letter amendment committed Delhi to the sale of all the Petro Grande gas for the extended period. On the other hand, Lohman, on behalf of Delhi, testified that the "price and terms" of the Petro Grande gas had not, at this point in time, been negotiated. Be that as it may, Taylor, on September 4, 1973, responded to Lohman's letter of August 29, 1973, noting that, after a telephone conversation between Lohman and Bailey on August 31, 1973, in which Lohman had agreed that the new price of 72¢ per MMBTU for TP gas would become effective on January 1, 1974, instead of September 1, 1973, Taylor said that with this understanding SMEPA would commit itself to buy the TP gas for the extended period, with a price redetermination each year based on highest selling price in the area for comparable sales, and, in the event the selling price, as redetermined, "becomes so high that South Mississippi (SMEPA) cannot economically continue to purchase it, South Mississippi (SMEPA) would then have the right to cancel the contract." (Parenthesis added). Lohman testified that the quoted language was objectionable in that conceivably Delhi, under the price redetermination terms of its contract with Texas Pacific, would have to pay more to Texas Pacific than a price considered by SMEPA to be uneconomical. Taylor closed with the following:

> "We would appreciate your proceeding with the conclusion of your arrangements with Texas Pacific, and we would then like to get with you at the earliest possible time to work out the details of a contract to include this commitment and purchase." [3]

Continuing with their negotiations, Delhi submitted to SMEPA a proposed letter agreement of September 11, 1973, amending the terms of their May 17, 1972 contract, basically as follows:

1. The TP gas would be dedicated to SMEPA for a ten year period ending September 1, 1983.

2. SMEPA would agree to pay Delhi 72¢ per MMBTU for all TP gas, with a 1¢ annual increase, together with price redeterminations as provided in the Delhi-Texas Pacific gas purchase agreement plus 15½¢ per MMBTU.

3. Delhi would be authorized to purchase additional gas for SMEPA in the Jasper-Clarke-Wayne County area at Delhi's cost plus 15½¢ per MMBTU.

4. The delivery point would be changed from SMEPA's Paulding plant to Delhi's Harmony plant, Delhi to construct a pipeline for this purpose with SMEPA paying approximately $500,000.00, and Delhi agreeing to reduce the price of gas by 2½¢ per MCF until a total of $500,000.00 had been recovered by SMEPA.

5. Delhi would dedicate additional residue gas to SMEPA available from Tonkawa Gas Processing Co., the price to be the same as the Texas Pacific gas.

6. The letter agreement of June 7, 1973 would be terminated and Delhi would dedicate to SMEPA all gas available under Delhi's contract with Petro Grande at 62½¢ per MMBTU, with a 1¢ increase on May 1, 1974, and each May 1 thereafter and the amount of any price redeterminations under Delhi's contract with Petro Grande.

7. SMEPA would be obligated to purchase 80% of all gas purchased by Delhi under the gas purchase agreements referred to.

8. The term of the original gas purchase contract of May 17, 1972, would be amended to terminate on September 1, 1983, and except for the amendments contained therein, the gas sales contract of May 17, 1972 would continue in effect.

---

3. As noted above, Delhi, by letter agreement of August 24, 1973 with Texas Pacific, extended the terms of the Delhi-Texas Pacific gas purchase agreement to September 1, 1983.

Taylor testified that the above proposals were not acceptable to SMEPA, and he sent Bailey to see Lohman in Dallas on September 12, 1973 to see what terms and prices could be agreed upon, particularly with reference to the quantity of gas to be taken by SMEPA and limitations on the prices. No agreement was reached as a result of that conference. As to the proposed letter agreement of September 11, 1973, Lohman testified that these proposals were in the interest of helping SMEPA to acquire a long term source of gas of at least 10,000 MCFD to justify the construction by SMEPA of a pipeline connecting its two plants at Paulding and Moselle, and that Delhi would be the best vehicle to furnish this supply through its gas gathering system in the area. Lohman testified that he suggested a change in the delivery point from SMEPA's Paulding plant to Delhi's Harmony processing plant because it was the central point of Delhi's gas gathering system; it could meet the requirements of the Environmental Protection Act which required a sulfur treatment, and because the Harmony plant had the capacity to treat from 15,000 to 20,000 MCF per day whereas SMEPA's Paulding plant could handle only 6,500 MCF per day. Lohman and Bailey discussed the quantities of gas available from the various sources, and Lohman admitted that Bailey did not object to the prices for the TP and Petro Grande gas, but that Bailey did object to a change in the delivery point, wanted a delay in the dedication of gas from the Tonkawa Processing Plant to which Lohman agreed, and wanted a different method of providing repayment to SMEPA for the cost of the pipeline, if the delivery point was to be changed, his suggestion being to substitute the actual cost plus 12% interest in lieu of $500,000.00. Lohman felt the two parties were close to an agreement following the conference of September 12, 1973 and that Bailey would return to Dallas where the various items could be reduced to contract form.

Instead, on September, 24, 1973, Taylor forwarded to Lohman copies of a proposed "Amendment No. 2" which had been executed on behalf of SMEPA for acceptance by Delhi. SMEPA proposed that Delhi dedicate the TP gas acquired by it from Texas Pacific for the extended term at 72¢ per MMBTU with the same price escalation and provisions for price redetermination as provided for in Delhi's gas contract with Texas Pacific, but that SMEPA would not be obligated to purchase more than 8,000 MCFD. As to the Petro Grande gas, Delhi was to dedicate the residue gas, available to Delhi under its contract with Petro Grande, for a term ending May 1, 1983, the price to Delhi increasing 1¢ per MMBTU on May 1, 1974 and each May 1, thereafter, and, in the event of a price redetermination, SMEPA would pay same unless such redetermination exceeded 3¢ per MMBTU in any one calendar year, in which event SMEPA would have the right to cancel, and in no event would SMEPA be obligated to purchase in excess of 2000 MCF per day of the Petro Grande gas. At the same time SMEPA agreed to amend the gas purchase contract of May 17, 1972 to reflect that the contract quantity would be 80% of the quantity purchased by Delhi under its contracts with Texas Pacific and Petro Grande. This proposal omitted any reference to Delhi's proposals of gas residues obtained by Delhi from other producers in Jasper, Clarke and Wayne Counties, to Delhi's proposed change of delivery point, and to Delhi's proposal to dedicate gas available under Delhi's gas purchase agreement with Tonkawa Gas Processing Company.

Lohman was emphatic that SMEPA's proposed Amendment No. 2 was unacceptable to Delhi, particularly as to prices and contract quantities. He objected to SMEPA's unilateral proposal that it could cancel the contract for the Petro Grande gas if the price exceeded 3¢ per MMBTU in any one year as offering Delhi no protection in case a redetermination under Delhi's contract with Petro Grande exceeded 3¢ per MMBTU. He also objected to SMEPA's limitation of the contract quantity of the TP gas to 8000 MCFD when Delhi was obligated to purchase 10,000 MCFD from Texas Pacific, and to SMEPA's limitation of the contract quantity of Petro Grande

gas to 2,000 MCFD when Delhi was obligated to purchase 5000 MCFD. Nor did he like SMEPA's refusal to change the point of delivery from the Paulding plant to Delhi's Harmony plant. Lohman said he felt obligated to tell Taylor that SMEPA and Delhi were getting further apart on negotiating terms and prices instead of closer. He nonetheless, arranged to meet Taylor in Hattiesburg on October 10, 1973. Lohman's and Taylor's separate accounts of this meeting widely differ. Taylor took with him Delhi's proposed letter agreement of September 11, 1973, which Bailey had discussed with Lohman the next day in Dallas, and as to which Lohman had made certain marginal notes. Bailey had also made marginal notes on a copy. On yet a third copy, Taylor attached a notation dated October 10, 1973 to the effect that he and Lohman had agreed to all notations appearing in blue and that the notations appearing in red, except the title, "Amendment No. 2 to gas sales contract between Delhi Gas Pipeline Corporation and South Mississippi Electric Power Association", were to be disregarded. According to these notations, as to the dedication by Delhi to SMEPA of the TP gas, Taylor agreed to pay the price of 72¢ per MMBTU with delivery to start December 1, 1973, and agreed to the annual price escalation of 1¢ per MMBTU per annum and to such price redeterminations as Texas Pacific required under its gas contract with Delhi. Taylor said he also agreed to a contract quantity of 10,000 MCFD of residue gas in a reduced geographical area that had no relation to either the TP or Petro Grande gas. Taylor said Lohman agreed to the deletion of Paragraph 4 relating to the change of delivery point and the construction of a pipeline from SMEPA's Paulding plant to Delhi's Harmony plant, agreeing that such could be the subject of a separate contract. Taylor said Lohman agreed to the deletion of Paragraphs 5 and 6, relating to the dedication of Delhi's residue gas under its contract with Tonkawa Gas Processing Company and the price, and, as to the dedication by Delhi to SMEPA of the Petro Grande gas, Taylor agreed to the 1¢ price escalation on May 1, annually, and said Lohman agreed that SMEPA could cancel this dedication on 120 days' notice, if a price redetermination exceeded 95¢ per MMBTU per day. According to his testimony, Taylor felt that he and Lohman had an agreement, and that Lohman was to return to Dallas to get Delhi's approval. On November 9, 1973, Taylor wrote Lohman a lengthy letter reciting the various conferences and communications he and Bailey had had with Lohman, including the conference at Hattiesburg on October 10, 1973, saying:

" . . . I thought you had agreed with me that we could settle the difference in this matter. Upon calling you the following week, however, you indicated that you could not get your people to go along with our agreements and we would have to make other concessions.

On November 2, 1973, Mr. Bailey called you on the telephone and made a definite offer for the purchase of the gas in settlement of the differences. You indicated that you would respond to him by calling on Monday or Tuesday, November 5 or 6.

Mr. Bailey tried all this week to call you, leaving calls for you to return several times. He was at last able to get you today, and you indicated you had a better offer for the sale of this gas from some other party and that you planned to proceed with the sale of the gas to that party.

This is to advise you that our interpretation of our contract amendment of June 7, 1973 is a firm commitment of the Petro Grande gas to South Mississippi Electric Power Association and to inform you that we are still willing to negotiate in good faith for a fair and equitable contract for the purchase of this gas. This is to further inform you that we intend to pursue every course available to us in the interest of successfully concluding a purchase contract for the Petro Grande gas.

We are willing, ready and able to meet with you and will deal in good faith toward making an agreement with you.

We feel that it was the intent of the parties in making the amendment of June 7, 1973, that reasonable efforts would be made to negotiate a price and terms which would be mutually agreeable to you and to us."

On the same day, Taylor, having reason to expect that the "other party" with whom Delhi was dealing, was Mississippi Power & Light Company (MP&L) of Jackson, wrote to a senior official of that company, informing him that all gas purchased or acquired by Delhi from Petro Grande had been committed by contract to SMEPA, that SMEPA and Delhi were in a conscientious effort to work out the details of the gas purchase. Taylor requested MP&L not to interfere.

Letters dated October 4 and 19, 1973, from Lohman to MP&L obtained through discovery, were introduced into evidence by plaintiff. The October 4 letter refers to a letter agreement concerning the temporary sale of gas from Delhi's Clarke County gathering system to MP&L, and the October 19 communication is a letter agreement, effective February 15 to July 1, 1974, whereby Delhi promised to use its best efforts to make available all gas not otherwise committed, anticipating that this quantity would average 3000 MCFD. The source of this gas is not reflected in the letter agreement.

The testimony of Norman Bailey, SMEPA's production manager, generally duplicated that of Taylor. He admitted that his conference with Lohman at Dallas on September 12, 1973 did not result in an agreement of contract quantities and prices. He talked by telephone with Lohman on September 29, 1973 trying to resolve the differences. Bailey said Lohman was to call him back but did not. On finally reaching Lohman on November 9, 1973, at which time Lohman said Delhi had a better offer from another party, Bailey reminded Lohman that SMEPA was entitled to all the Petro Grande gas by virtue of the letter amendment of June 7, 1973.

Lohman, sole witness for Delhi, reviewed his efforts on behalf of Delhi to locate sources of gas for SMEPA. At the time of the original gas purchase contract of May 17, 1972, although the source of the gas was not reflected therein, Lohman said the gas came from Texas Pacific's Lake Como Field in Jasper County. This is not disputed. Dehli's contract with Texas Pacific was for a short term of eighteen months because the field was new and its reservoir unknown. Hence, Delhi's contract with SMEPA was for the same period. In order to deliver this gas to SMEPA's Paulding plant, Delhi constructed a pipeline from its Clarke County gathering system to Paulding at a cost of $800,000.00. Meanwhile the price of gas increased over an eleven month period from 27¢ to 53½¢ MMBTU. Delhi began deliveries to SMEPA from both sources of gas, Texas Pacific and Petro Grande, at about the same time. Both sources together did not furnish the quantity of 10,000 MCFD as desired by Delhi, hence his efforts to include other uncommitted sources. Although Delhi's contract with Petro Grande was for a ten year period, it was necessary for Delhi to acquire an extension of its contract with Texas Pacific for which Delhi had to pay a higher price, and include price escalation and price redetermination clauses.

In Bailey's proposal of June 1, 1973, obligating Delhi to make *all* Petro Grande gas available to SMEPA, Lohman pointed out this language was Bailey's, Lohman's only insistence being that terms and prices for the extended contract be mutually agreeable to both parties. Lohman pointed out that Delhi's proposed letter agreement of September 11, 1973, included a dedication of all Petro Grande gas available to Delhi. After Taylor turned down this proposed letter agreement, Lohman said Taylor made SMEPA's proposal of September 24, 1973, limiting the quantity of Petro Grande gas that SMEPA was obligated to take to 2000 MCFD. In each instance that SMEPA refused to agree to price escalations, proposing instead the unilateral right to SMEPA to cancel if the price went above a certain amount, Lohman said he could not accept such as they left him with no protection against price escalation clauses in Delhi's

contracts with Texas Pacific and Delhi. Lohman objected to SMEPA's contract quantity obligation to take 8000 MCFD of the TP gas when Delhi had obligated itself to take 10,000 MCFD from Texas Pacific, and to SMEPA's contract quantity obligation to take 2000 MCFD of Petro Grande gas when Delhi had obligated itself to take 5000 MCFD under its contract with Petro Grande. However, his main objection was to SMEPA's insistence to have the right to cancel the contract if the Petro Grande gas price redetermination exceeded 3¢ per MMBTU, when Delhi had no such protection in its contract with Petro Grande.

Nonetheless all three witnesses' accounts of the various negotiations leading up the the conference between Lohman and Taylor on October 10, 1973 in Hattiesburg, are generally not in dispute and clearly show that up to that time there was no mutual agreement on terms and prices for an extended contract.

Lohman's account of the October 10, 1973 meeting with Taylor agreed in one initial matter. They agreed to consider in detail the items appearing in Delhi's proposal of September 11, 1973 which they did consider, but Lohman said he did not agree to any of Taylor's counter proposals. In renegotiating Delhi's contract with Texas Pacific for an extended term at Taylor's request, Delhi had to agree to a higher price for deliveries beginning September 1, 1973, this price being higher than SMEPA was required to pay Delhi for TP gas under the May 17, 1972 contract. Taylor insisted that Delhi absorb the loss up to January 1, 1974. The copy of the proposal of September 11, 1973 with the red and blue notations had the date of December 1, 1973 ringed in blue. According to Taylor this meant Lohman had agreed for Delhi to absorb the higher price up to December 1, 1973. Where Taylor noted on his copy in blue that Lohman had agreed that SMEPA could cancel the contract if the price of Petro Grande gas exceeded 90¢ per MMBTU, Lohman said he did not agree to this nor a top price of 95¢ per MMBTU as Taylor testified to. He denied that he agreed to change the delivery point back to Paulding. He denied that

he agreed to take back to Dallas for approval by Delhi the points Taylor said they had agreed on. Lohman considered the negotiations at an end.

On January 11, 1974, Lohman wrote Taylor referring to the fact that the eighteen month contract of May 17, 1972 between Delhi and SMEPA would terminate on February 1, 1973, and despite their considerable negotiations regarding the extension of the contract ending with Taylor's letter of November 9, 1973, said:

"  .   .   .  these negotiations did not result in our reaching mutually agreeable price and terms for extending the contract, and we are now in the process of selling this gas to another customer on essentially the same terms as our written offer to you dated September 11, 1973.

.   .   .  it is my opinion that I negotiated with you in good faith trying to arrive at a mutually satisfactory contract so that deliveries to you could be continued for a ten (10) year period. You were never willing to accept our terms as to price, quantity, or delivery point, all of which are basic considerations in any gas contract."

Further in the letter, Lohman reminded Taylor that early in the negotiations there were not sufficient gas reserves to justify the construction of a pipeline between SMEPA's two plants, particularly as Delhi's contract with Texas Pacific was of short duration, that Taylor had requested Lohman to get an extension on the TP gas, that Delhi, in order to do so, had to increase the price it paid Texas Pacific to 56¢ MMBTU, an increase of 18¢, beginning September 1, 1973, which SMEPA refused to bear until January 1, 1974, and that SMEPA had never agreed to change the delivery point from Paulding to Harmony. After reviewing other areas of disagreement, and, noting that efforts to resolve the differences over a six weeks' period, including three meetings and 21 telephone conversations, had ended in failure, Lohman expressed the opinion that Delhi had fulfilled fully its obligations to SMEPA.

Then, in this same letter, Lohman made an offer, which he characterized during his testimony as a new offer. It follows verbatim:

"However, we would be willing to sell you the residue gas available from our Petro Grande contract, not to exceed 2000 MCFD for the remainder of our contract with them. The delivery point for this gas would be our Harmony Plant at a pressure not to exceed 500 psig. The price would be our cost plus 15¢ per MMBTU. This would make the initial price 62¢ per MMBTU, with the price being redetermined each time the price was redetermined in our Petro Grande contract. In order to allow you time to construct a pipeline from the current delivery point to our Harmony Plant, we would agree to continue delivering the gas to you at the existing delivery point for a six (6) month period, provided you pay us $4,000 per month to cover the cost of operating this delivery facility. If you are not able to accept gas at our Harmony Plant by August 1, 1974, the contract covering this gas would terminate. This offer is subject to your notifying us in writing of your acceptance by January 25, 1974, absent which we shall sell this gas to another customer."

On January 22, 1974, Taylor acknowledged receipt of Lohman's letter of January 11, 1974, saying that SMEPA was seriously considering the proposal, but, since several factors needed to be clarified, Taylor needed an extension of a week's time. This was granted. On January 29, 1974, Taylor wired Lohman as follows:

"We hereby accept the terms of purchase of Petro Grande gas as outlined in your letter of January 11, 1974. We do, however, insist that you abide by the terms of our contract amendment dated June 7, 1973 and make all the Petro Grande Gas available to us. We have paid you the additional price during the primary term of our gas contract and are hereby meeting your terms as to price and delivery of the gas and thereby have fulfilled all the terms of this contract. We therefore claim the right to purchase from you all the Petro Grande gas as stated in our amendment of June 7, 1973. Our letter follows."

In the letter that followed, dated January 30, 1974, Taylor, while noting that he did not agree with certain of Lohman's interpretations as to the negotiations carried on, nonetheless accepted the conditions outlined in Lohman's letter of January 11, 1973 with the exception that "we do not accept the limitation of 2,000 MCF per day." Taylor quoted from the contract amendment of June 7, 1973 which provided "All gas obtained by Delhi Gas Pipe Line Corporation (the buyer) shall be made available to South Mississippi Electric Power Association (the buyer) for the terms of the existing gas sales contract, subject to price and terms mutually agreeable to the seller and to the buyer, and for an additional term of which when added to the remaining term of the existing gas sales contract will equal ten (10) years." Taylor, in expressing his understanding of Lohman's offer, agreed item by item (1) to a delivery point at Delhi's Harmony plant at a pressure of 500 psig; (2) to Delhi's cost of Petro Grande gas plus 15¢ per MMBTU; (3) to a price redetermination each time the price was redetermined in Delhi's Petro Grande contract; (4) to accepting delivery at SMEPA's Paulding station for a period of six months beginning February 1, 1974, or until such time as SMEPA was able to complete a pipeline to the Harmony plant; (5) to pay Delhi $4,000.00 per month during the time the gas was delivered to Paulding; and (6) to recognize that if SMEPA did not get the pipeline built or accept delivery by August 1974, the contract would terminate. Taylor added a seventh proposition which would require that Delhi make available to SMEPA such of its rights of way that would enable SMEPA to construct a second pipeline on Delhi's right of way from the Paulding plant to Delhi's Harmony plant.

In a mailgram of February 2, 1974, Lohman advised Taylor that he, Lohman, considered Taylor's telegram of January 29, 1974, a counter-offer to Lohman's compromise offer of January 11, 1974; that Loh-

man considered negotiations to be at an end; and that all prior offers were withdrawn.

This litigation ensued.

In his testimony at the trial, Lohman stated that, where Delhi, in August 1973, had made a temporary, short term agreement with MP&L up to July 1, 1974, to make available residue gas in the area of Delhi's Clarke County gathering system not otherwise committed, following the breakdown of negotiations with SMEPA and the termination of the Delhi-SMEPA contract on February 1, 1974, he, Lohman, did negotiate a 20 year gas purchase agreement, dated July 1, 1974, with MP&L dedicating the TP and Petro Grande gas on terms more favorable to Delhi than the proposals discussed with SMEPA, giving as examples: (1) the highest price offered by SMEPA for the Petro Grande gas was 90¢ to 95¢ per MMBTU, whereas MP&L agreed to a price redetermination, with a right to cancel on 120 days' notice, only if the price exceeded $1.00 per MMBTU, and, at the time of the trial, had not cancelled although the redetermined price had reached $1.25 per MMBTU; (2) SMEPA, while insisting that all TP gas and all Petro Grande gas be made available to it, limited its obligations to take such gas to not more than 8000 MCFD of TP gas, and not more than 2000 MCFD of Petro Grande gas, whereas MP&L agreed to take all the residue gas without limitations and over a longer term; (3) nor was the necessity of constructing a pipeline present in the MP&L contract.

The opposing contentions of the parties are simply stated. The plaintiff claims that the letter agreement of June 7, 1973, together with the contract dated May 17, 1972, constituted an agreement by the defendant to deliver to plaintiff *all* gas obtained by the defendant from Petro Grande, subject to price and terms to be agreed upon, and when plaintiff, by telegram of January 29, 1974, followed by plaintiff's letter of January 30, 1974 accepted the offer of the defendant in Lohman's letter of January 11, 1974, the price and terms were agreed upon. Plaintiff, on the basis of Delhi's alleged breach of the agreement, claims that the cost of fuel to replace that not furnished by Delhi from February 1, 1974 through February 1977, amounts to $1,434,763.00, which sum SMEPA seeks as damages. Alternatively, SMEPA seeks this sum less the cost of the pipeline from Paulding to Harmony, had it been constructed, for alternative damages in the sum of $825,791.00.

Defendant simply says that the parties never did agree on the essential or material terms of a contract, and that, in any event, plaintiff has suffered no damages in that plaintiff is now converting fuel oil to electricity at its Moselle plant at less cost than the natural gas it would have bought from Delhi had a contract been agreed upon.

At first blush, the Court was impressed with plaintiff's argument that in the June 7, 1973 letter amendment, Delhi did commit itself to make available to SMEPA all Petro Grande residue gas available to it under its contract with Petro Grande. Delhi accepted this language, although authored by Bailey, insisting only, with respect to price and terms that they be mutually agreed upon. Both parties agree that the essential terms in any gas sales agreement are (1) price; (2) quantity, and (3) delivery point. A fourth element, pressure point, is not involved herein. Looking at the problem most favorably for plaintiff, although the Petro Grande gas was not included in the gas purchase contract of May 17, 1972, Delhi did have its own ten year purchase contract with Petro Grande for Petro Grande gas reserves in the McNeil Field in Jasper County whereby Delhi was obligated to take up to a maximum of 5000 MCFD at initial delivery with provisions for price redetermination at the end of the first year if deliveries exceeded 2000 MFCD, and, if not, at the end of two years. This gas was therefore available to SMEPA through Delhi for the proposed extension of their contract with nothing lacking except for Delhi and SMEPA to agree on the price, and delivery point, which the May 17, 1972 contract fixed at Paulding, but only for TP gas. Therefore, when SMEPA paid Delhi

the sum of $46,486.71 for this gas from first delivery up to February 1, 1974, as Taylor so testified, and agreed to pay 62¢ per MMBTU thereafter throughout the balance of the ten year term, subject to price redeterminations each time the price was redetermined by Petro Grande, and agreed for delivery to be at Delhi's Harmony plant, plaintiff vigorously contends it had a contract for the Petro Grande gas, as well as for the TP gas.

The problem is not so simple. Under the May 17, 1972 short-term contract, only the TP gas was covered. This gas was from the Texas Pacific Como Field. Delhi committed itself to take this gas up to a maximum of 10,000 MCFD, and bore the cost of constructing a pipeline from its Harmony Processing Plant to SMEPA's Paulding plant some eight miles away, the delivery point. Under the Delhi-SMEPA contract, Delhi committed itself to deliver a quantity of that gas up to a maximum of 6,500 MCFD, with SMEPA to take and pay for an average of 4000 MCFD, the full capacity of the Paulding plant being 6500 MCFD. The purpose of the meeting in Jackson between Lohman and Bailey, with Berry, the pipeline contractor present, was to determine if Delhi had sufficient sources in the vicinity of its Clarke County gas gathering system to supply to SMEPA for a long enough period of time to justify the expense to SMEPA of constructing a pipeline between its Paulding and Moselle plants, the latter having a greater capacity than Paulding. Delhi, accordingly, undertook to supply gas from sources in addition to that available from Texas Pacific and to, at Taylor's request, re-negotiate its short term contract with Texas Pacific to a ten year term in order to supply SMEPA with a minimum of 10,000 MCFD. Hence the proposed letter amendment of June 7, 1973. The contract quantity of TP gas SMEPA was required to take was not varied from the original contract, which remained in effect as amended. The letter amendment proposed only a price change for the TP gas reflecting the higher charge made by Texas Pacific in extending its gas purchase contract with Delhi to the longer term. As stated above, Delhi ac-

quired the Petro Grande gas by contract dated April 6, 1973, for a 10 year term, under which Delhi was obligated to take all gas made available by Petro Grande up to a maximum of 5,000 MCFD. When Delhi and SMEPA, under the letter amendment of June 7, 1973, began negotiations, deliveries of both TP gas and Petro Grande gas were averaging no more than 2000 MCFD each. Hence Delhi's offer of September 11, 1973, to dedicate *all* the TP gas and *all* Petro Grande gas available plus that from other sources within the area of Delhi's Clarke County gathering system in order for SMEPA to justify constructing its own pipeline between Paulding and Moselle. This offer was not acceptable to SMEPA. SMEPA, in turn, on September 24, 1973, offered its proposals, limiting its contract quantity obligations to no more than 8000 MCFD of TP gas and to no more than 2000 MCFD of Petro Grande gas, which was not acceptable to Delhi for the reason that these limitations did not protect Delhi under its obligations to take more under its respective contracts with Texas Pacific and Petro Grande. As also noted above, it is and was obvious that the parties were growing further apart in their negotiations. It is not known to the Court why, in the subsequent unfruitful negotiations, that SMEPA retreated from its former position of wanting to limit its contract quantity for the Petro Grande gas to 2000 MCFD and decided it wanted all the Petro Grande gas made available to it. The fact remains that in these negotiations SMEPA at no time agreed to take and pay for all Petro Grande gas. As this Court understands the give and take efforts necessary in arriving at a gas purchase contract, a seller may dedicate or make available all or a part of gas available to it, but there is no agreement or meeting of the minds without a corresponding obligation on the part of the purchaser to take a contract quantity, as that term is defined in the contract of May 17, 1972, of gas the seller agrees to take and pay for. This is necessary in order for the seller to be able to gauge whether the proposals are profitable or not. Under the facts and circum-

256

stances surrounding this case, the Court finds that the price of the gas was inextricably a part of the agreement dependent on the quantity to be purchased by SMEPA. Conversely a contract quantity could well affect the price. When Delhi offered all the Petro Grande gas at a fixed price, SMEPA refused. When SMEPA countered, limiting its obligation to no more than 2000 MCFD of Petro Grande gas, with the added proviso that it could cancel a long term contract if the price rose more than 3¢ per MMBTU in any one year, this proposal offered no protection to Delhi under its long term contract with Petro Grande. If there was a subsequent meeting of the minds on October 10, 1973, the Court assumes a mutually agreeable contract would have been forthcoming. None did. Accordingly, the Court agrees that the negotiations, taking place over a period of time from August 29, 1973 to and including November 9, 1973 [4] did not result in mutually agreeable price and terms, and that Lohman's proposals in his letter to Taylor of January 11, 1974 did constitute a new offer which SMEPA could take or leave. SMEPA's replies by mailgram and letter of January 29 and 30, 1974, constituted a counter-offer, particularly if one reads into it that SMEPA not only insisted on all Petro Grande gas being made available to it, but agreed to take and pay for all such gas.

Both parties have incurred expenses that are not reimbursable. Delhi constructed pipeline and equipment in its gathering system to transport gas from the Lake Como and McNeil Fields to SMEPA's Paulding plant at a cost of over $1,100,000.00, according to Lohman, plus the additional cost assessed by Texas Pacific for an extension of its contract for TP gas from September 1, 1974 until February 1, 1974. According to SMEPA's witnesses SMEPA was damaged in the amount it herein seeks for the difference it had to pay for gas purchased from other sources in addition to which SMEPA had an outlay of some $60,000.00 for right-of-ways for its proposed pipeline between Paulding and Moselle, and reimbursed Berry's pipeline construction corporation for $60,000.00 as interest on pipeline ordered by the contractor for the Paulding to Moselle pipeline which was never constructed.

The Court finds neither party guilty of bad faith in their negotiations. The parties simply did not arrive at a mutually acceptable agreement following the letter amendment of June 7, 1973, which, in fact, was an agreement to agree.

Whether considered from the standpoint of applicable common law and Mississippi case law or as a transaction governed by applicable sections of Mississippi's Uniform Commercial Code, or both, the result is the same. The Court need rely only on pertinent authorities, cited by defendant in its brief, as follows:

"Unless all the terms and conditions are agreed on, and nothing is left to future negotiations, a contract to enter a contract in the future is of no effect . . . . Where an agreement contains the stipulation that certain terms shall afterward be settled by the parties, it will become binding as to terms when, and only when, they are afterward agreed on. The enforceability as a contract of an agreement which leaves a matter for future negotiations depends on the relative importance and severability of the matter left to the future. It is a question of degree to be determined of whether the matter left open is so essential to the bargain that inability to enforce that promise would render the enforcement of the rest of the agreement unfair. Where an essential element is left for future [negotiations], there is no contract." 17 C.J.S. Contracts § 49 at pp. 702-04.

" . . . Unless an agreement to make a future contract is definite and certain upon all the subjects to be embraced, it is nugatory. To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave nothing to be agreed upon as a result of future negotiations. Where a final contract fails to express some mat-

4. During this time the price of natural gas was escalating rapidly.

ter, as, for instance, a time of payment, the law may imply the intention of the parties; but where a preliminary contract leaves certain terms to be agreed upon for the purpose of the final contract, there can be no implication of what the parties will agree upon. If any essential term is left open for future consideration, there is no binding contract, and an agreement to reach an agreement imposes no obligation on the parties thereto." 17 Am.Jur.2d, Contracts, 26 at p. 362.

Mississippi has essentially adopted the above rules. In *Allen v. Powell,* 260 So.2d 182, the Mississippi Supreme Court, in speaking of enforceability, said: "The specific performance of a contract will not be decreed unless it is certain in its terms." This sentence and the rest of the paragraph that followed were lifted and quoted verbatim from *Giglio v. Saia,* 140 Miss. 769, 106 So. 513, which in return relied on similar language in earlier Mississippi cases.

Similarly, in *Union Oil Company of California v. Wood,* 297 So.2d 819, the Mississippi Supreme Court said:

"A promise to 'give consideration to a claim' or to 'endeavor to arrive at a mutually satisfactory settlement' with regard to a doubtful and unliquidated claim is too indefinite to be enforceable as a contract. Such an agreement invites future controversy and is unenforceable even assuming that the other formalities necessary to a binding contract exist."

Plaintiff, for the sake of argument, contends that even though a contract may be unenforceable, it does not follow that damages do not lie, relying on language of similar import in *Mid-Continent Telephone Corp. v. Home Telephone Co.,* D.C., 319 F.Supp. 1176. In that case Judge Keady found that the inability of a court to grant specific performance due to significant changes in the position of the parties did not preclude damages that were ascertainable. In the case sub judice the Court has found that no contract or agreement was accomplished. Ergo, a breach of contract is not involved. Should damages otherwise

lie, such as for the failure of one party or the other to carry on good faith negotiations or arbitrarily refuse to negotiate, this Court has earlier found neither party guilty of bad faith. Nor can it find that one party was any more arbitrary than the other.

Plaintiff relies on part of Mississippi's Uniform Commercial Code, Section 75–2–204, Mississippi Code of 1972. This section provides (1) a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract; (2) an agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined; (3) even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy. Moreover, as plaintiff claims, Section 75–2–305 provides, in part, (1) the parties, if they so intend, can conclude a contract for sale even though the price is not settled. In such case the price is a reasonable price at the time for delivery if . . . (b) the price is left to be agreed by the parties and they fail to agree . . . ".

The Court has recited, and in inordinate detail[5] the attempted negotiations of the parties to arrive at a mutually agreeable price and terms on which to conclude that, although the parties intended to agree on such, price being such an interwoven part of and dependent on the quantity of gas SMEPA would agree to take delivery of, which was never agreed on, there was no agreement, nor can this Court make one.

For the reasons given above, the Court finds that the parties did not mutually agree on price and terms; hence there is no enforceable contract or breach of contract or bad faith or arbitrary conduct on the part of Delhi which would support an award of damages in favor of plaintiff. Accordingly plaintiff's action must be dismissed.

---

5. All written material or copies referred to are in evidence.

An appropriate order dismissing the suit and taxing court costs to the plaintiff may be submitted within the time and manner provided by the rules of the Court.