# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-01634-SCT

*GULF COAST HOSPICE LLC, A MISSISSIPPI
LIMITED LIABILITY COMPANY, JYOTI DESAI,
KRUPA DESAI AND IQBAL SAVANI*

*v.*

*LHC GROUP INC., A DELAWARE
CORPORATION, MISSISSIPPI HEALTH CARE
GROUP, LLC, A MISSISSIPPI LIMITED
LIABILITY COMPANY AND LHCG XXVI, LLC, A
MISSISSIPPI LIMITED LIABILITY COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/06/2017 |
| TRIAL JUDGE: | HON. CHRISTOPHER L. SCHMIDT |
| TRIAL COURT ATTORNEYS: | MICHAEL B. HOLLEMAN |
| | TAYLOR B. McNEEL |
| | STEPHEN J. CARMODY |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | MICHAEL B. HOLLEMAN |
| | PATRICK WILLIAMS |
| ATTORNEYS FOR APPELLEES: | TAYLOR B. McNEEL |
| | STEPHEN J. CARMODY |
| | L. KYLE WILLIAMS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 06/06/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.    Louisiana Hospice Corporation, otherwise known as LHC, sought to acquire Gulf

Coast Hospice LLC in D'Iberville, Mississippi.  LHC and Gulf Coast Hospice executed a

letter of intent outlining the basic terms of the proposed acquisition.  Ultimately, the parties

failed to consummate the transaction. Gulf Coast Hospice LLC and its members, Jyoti Desai, Krupa Desai, and Iqbal Savani[1] sued LHC Group Inc., LHCG XXVI LLC, and Mississippi Health Care Group LLC,[2] asserting several theories of liability stemming from the failed acquisition.

¶2.    The trial court granted LHC's motion for summary judgment and dismissed Gulf Coast Hospice's claims. Gulf Coast Hospice appeals, arguing that genuine issues of material fact should have prevented summary judgment. Gulf Coast Hospice's chief argument is that LHC entered into an enforceable contract to acquire its hospice operations. Alternatively, Gulf Coast Hospice argues that if no enforceable contract to purchase exists, its claims for breach of contract and duty of good faith with respect to the letter of intent and tortious interference should have survived summary judgment.

¶3.    We hold that no enforceable contract exists, that the doctrine of estoppel is inapplicable, and that no genuine issue of material fact exists regarding Gulf Coast Hospice's misrepresentation claims. We further hold no genuine issue of material fact exists regarding Gulf Coast Hospice's alternative claims. As such, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶4.    Between June 2007 and December 2008, Prasant Desai owned and operated Gulf Coast Hospice. Around December 2008, Prasant transferred his 100 percent ownership interest to his mother Jyoti Desai (50 percent ownership), his sister Krupa Desai (25 percent

---

[1]  For clarity, the Appellants are collectively referred to as Gulf Coast Hospice.

[2]  For clarity, the Appellees are collectively referred to as LHC.

2

ownership), and Dr. Iqbal Savani[3] (25 percent ownership). Jyoti's husband Haresh Harry Desai, who is Prasant's and Krupa's father, was the "managing member of the board for the meetings[,]" did "some paperwork[,]" and "handl[ed] the checkbooks." Although the record is unclear about Harry's actual role with Gulf Coast Hospice, the parties do not dispute that he served in a representative capacity and handled negotiations.[4]

¶5.     Around the time of the ownership transition within the family, Gulf Coast Hospice hired Linda Rogers to serve as director of nursing and administrator. Shortly after Rogers's hire, she became the primary decisionmaker in charge of daily operations. Neither the Gulf Coast Hospice members nor Harry had any role in daily operations. Under Rogers's leadership, profits and revenues grew by substantial amounts. Of importance, the patient census grew from six to fifty by the end of 2010. Harry considered Rogers to be the key employee running daily operations, as well as the most valuable employee.

¶6.     In November 2010, independent broker Craig Kincannon contacted Harry, inquiring whether Gulf Coast Hospice would be interested in selling its hospice operations to LHC. Harry responded affirmatively. On December 27, 2010, LHC and Gulf Coast Hospice entered into a letter of intent with respect to the proposed acquisition of Gulf Coast Hospice's operations. The first paragraph provided as follows:

> This letter sets forth our mutual understandings with respect to the basic terms of a proposed acquisition by LHC Group, Inc. ("**LHCG**") of the assets of the

---

[3] Dr. Savani is a physician and an acquaintance of the Desai family.

[4] Although Harry never had an ownership interest in the company, he regularly told Rogers that he was an owner. Harry also told Rogers that he owned the building where Gulf Coast Hospice was located even though his son Prasant owned the building.

3

hospice operations of Gulf Coast Hospice ("**Seller**") that serve the Mississippi counties of George, Hancock, Harrison, Jackson, and Stone (the "**Business**"). As more fully described in this letter, it is our mutual intent to negotiate a satisfactory, definitive asset purchase agreement (the "**Asset Purchase Agreement**") and such other documents as may be necessary to consummate the proposed transaction (together with the Asset Purchase Agreement, the "**Agreements**"). The intention to consummate the transaction described herein (the "**Transaction**") is subject to the following terms and conditions:

¶7.   The four page letter of intent continued by outlining terms and conditions of the proposed transaction and included the tentative proposed purchase price of $1.75 million, "[b]ased on the information made available thus far[.]" Paragraph five contained a non-exhaustive list of conditions to closing:

**Conditions to Closing**. The Closing of the Transaction shall be subject to the satisfaction of mutually agreeable terms and conditions, including, without limitation, the following:

(a)   Negotiation, execution and delivery by the parties of the Agreements;

(b)   The approval of the transactions contemplated herein and the Agreements by the Board of Directors or other governing body of each party, approval of which shall be obtained by each party prior to the execution of the Agreements;

(c)   Satisfactory completion of due diligence by LHC[] and its affiliates;

(d)   Receipt of all necessary consents and approvals of state and federal governmental authorities and other third parties, if any;

(e)   Receipt of adequate assurances from the applicable state Department of Health Services and the federal Centers for Medicare and Medicaid Services that the home health agency licenses and provider agreements with the Medicare and Medicaid programs are in good standing

4

and are transferable to [LHC]. LHC[] or one of its affiliates will be responsible for obtaining the foregoing assurances timely; and

(f)     Satisfaction of such other conditions as may be reasonable and customary in acquisition agreements.

¶8.    Paragraph fourteen provided, in pertinent part, as follows:

**Non-Binding Effect.**  It is understood that this letter merely constitutes a statement of the mutual intentions of the parties with respect to the Transaction, does not contain all matters upon which agreement must be reach in order for the Transaction to be consummated and, except in respect to Paragraphs 6 through 13, inclusive, and this Paragraph 14, creates no binding rights in favor of any party.  A binding commitment with respect to the Transaction will result only if the Agreements are executed and delivered, and are then subject only to the terms and conditions contained therein.

¶9.    The letter of intent granted LHC the ability to "conduct, to the extent determined desirable or necessary by its own discretion, a review of the business, assets, liabilities, financial condition and results of operations, properties owned or operated by [Gulf Coast Hospice] and the books and records of [Gulf Coast Hospice]."

¶10.   On January 4, 2011, LHC's project manager Dustin Delahoussaye for the Gulf Coast Hospice acquisition emailed Harry. Dustin explained the preliminary steps of the acquisition process, attached several documents to be either reviewed or completed, summarized the documents, and informed Harry that LHC's attorney would send draft documents in the weeks to come.  An acquisition timeline attached to the email provided a target closing date of February 28, 2011, and the "Target Effective Date 3/1/2011."  On January 7, 2011, LHC emailed Harry transaction documents, including a draft asset purchase agreement labeled "LHCG Draft" and "For Discussion Purposes Only."  LHC also sent a change of ownership

5

notification to the Mississippi State Department of Health's Health Facilities Licensure and Certification Division. LHC notified the Department that, effective March 1, 2011, LHC would be purchasing Gulf Coast Hospice.

¶11. On January 13, 2011, Dustin emailed LHC employees Lori Stagg, vice president of LHC hospice operations, and Brach Myers, assistant director of acquisitions, informing them of Harry's concern that LHC attempt to retain all employees or, at minimum, try to find positions for them with LHC. Dustin explained that, although Rogers's salary is much higher than LHC's staffing model for administrators, "keeping Linda [Rogers] is key to this deal and we must keep her on board."

¶12. On January 28, 2011, Dustin emailed fellow LHC employees: "As you all are aware of at this point, we are set to acquire Gulf Coast Hospice in D'Iberville, MS effective on 3/1." Dustin generally briefed the LHC employees about Gulf Coast Hospice and described Rogers's role with Gulf Coast Hospice. On January 31, 2011, Rogers had a dinner meeting with LHC employees Stagg and Shelly Denton, LHC's hospice regional manager. The three discussed compensation, and Rogers told them about her success. Following the dinner, Stagg emailed Dustin explaining that Rogers seemed capable but that she had refused to accept a salary of $85,000 with a 12 percent bonus. Rogers told Lori and Denton that she would accept a salary of $102,000. Stagg explained that LHC "cannot pay her this salary for a Hospice this size especially since she would make 30K more than the other Administrators and more than her supervisor, Shelley [Denton]." Stagg also explained that Rogers had told them that Gulf Coast Hospice staff were worried about the mandatory staff meeting

6

scheduled for the next day. Stagg mentioned that "the broker [had] 'promised' them that LHC would not cut anyone's salary."

¶13. On February 1, 2011, a team of LHC representatives arrived at Gulf Coast Hospice and met with employees. With Gulf Coast Hospice's permission, LHC announced to employees that it was to acquire Gulf Coast Hospice, effective March 1, 2011. LHC showed a presentation about its company and provided additional written materials, including employee benefits. Gulf Coast Hospice employees became disgruntled when they were advised about proposed changes to their pay structure.

¶14. LHC and Rogers collaborated to address staff changes to fit LHC's staffing model in anticipation of the effective date. At the time, Gulf Coast Hospice had fourteen full time employees, but LHC's models provided for ten and a half. LHC did not choose what remaining employees would be subject to staff reductions. Harry confirmed that no employee "was ever fired at the direction of LHC."

¶15. Rogers chose the three individuals with the most write-ups to be advised that they would not be extended offer letters to remain with LHC—Rhonda Schwan, Jamie Schonewitz, and Jennifer Morris. It was also decided that part time social workers Tim Jones and Kimberly Fayard would not be retained by LHC because they were full time employees of Amedisys, a competitor of LHC's home health business and a referral source to Gulf Coast Hospice. Rogers informed LHC that Jones and Fayard would rather keep their full time jobs with Amedisys than work part time for LHC. Gulf Coast Hospice employed two full time marketing employees, Crystal Miller and Leslie Hensarling. Because LHC's

staffing model provided for one full time marketing employee, Rogers proposed a solution to keep one marketing employee full time; the other would remain a marketing employee and would absorb Schwan's duties. LHC agreed.

¶16.    During February, LHC undertook several tasks onsite in preparation of the effective date of March 1, 2011, so that no interruption in operations would occur after closing. LHC installed a new telephone system, changed telephone providers, installed a new computer system connected to the LHC nationwide network, set up employees with LHC email accounts, and changed the pest control contract for the building, all set to take effect March 1, 2011. LHC also transferred utility services to its name, effective March 1, 2011.

¶17.    On February 8, 2011, Dustin emailed Rogers, informing her that LHC's HR team would arrive at Gulf Coast Hospice on February 10 and February 11 to present offer letters, compensation reviews, and benefits enrollments.[5] Rogers responded, "Great" and confirmed that she would inform the employees who would not be retained. Rogers did not advise Schwan, Schonewitz, and Morris that they would be not be retained. Rogers had informed Harry about the proposed layoffs, but he told her, "you don't fire nobody until they have taken over."

¶18.    On February 10 and 11, LHC's HR team arrived onsite as scheduled and conducted individual meetings. Gulf Coast Hospice employees completed new hire information sheets, provided driver license information, provided information for direct deposit purposes,

_____

[5] Any material changes to which the dissent refers would have gone into effect only had the closing occurred.

8

photographed for LHC identification badges, submitted to background checks, and underwent drug screening. During the individual meetings, Schwan, Schonewitz, and Morris were informed that they would not be retained by LHC.

¶19. Gulf Coast Hospice employee RN Gail Wisgoski presented to the HR team for her individual meeting, but she was not on the list of current employees. Consequently, LHC informed her that it did not have an offer letter for her. Rogers recently had recruited and hired Wisgoski from another hospice company. Rogers became upset about the situation with Wisgoski and complained to LHC. Rogers felt that LHC's proposed solution to offer Wisgoski a part time position was not sufficient. Dustin and Rogers disagreed about why Wisgoski did not have an offer letter. Ultimately, Dustin told Rogers that the situation had been a result of "really bad miscommunication." Rogers testified that "at that point is when I decided [LHC] would never make me mad again, that I would not work for them." Rogers did not disclose her decision to LHC.

¶20. On February 10, 2011, Dustin sent an email to Harry explaining the reasons why certain employees would not be retained. Dustin also apologized for the situation regarding Wisgoski. Dustin assured Harry, "We remain confident in you, Linda [Rogers], and all of our team members' ability to work through these problems, and we remain committed to you, the staff, and Gulf Coast Hospice."

¶21. On February 11, 2011, Harry told the broker to send "the final agreement with the new purchase price that takes into account the money for Linda [Rogers's bonus] and the severance for the volunteer coordinator." LHC's in-house counsel emailed Dustin, "if we

9

expect to close 2/28, we need [Gulf Coast Hospice's] comments to the documents and schedules NOW!"

¶22. On February 12, 2011, Rogers told Harry she would not work for LHC. Rogers testified that Harry and Dr. Savani told her not to say anything about her intention. Dr. Savani did not recall the conversation. Harry denied telling Rogers not to say anything to LHC but claimed that Rogers had already informed LHC that she would not work for LHC. Harry also claimed that "She's not supposed to tell anybody what she's doing." Rogers testified that she never told LHC her intention; instead, she told LHC, "I'm not sure, but I will let you know[.]" Rogers testified that when Harry and Dr. Savani heard about Rogers's statement, they confronted her. Rogers described the meeting:

> Harry saw [Gulf Coast Hospice employee] Crystal Miller outside of the building somewhere, and he told Crystal Miller that I made a mistake, that I shouldn't have said that. And then he and Dr. Savani came. I don't know if it was the same day or a couple of days later in my office and said, you shouldn't have said that. You made a mistake. And they were very upset with me. And I said, you guys have put me in a bad situation, where you are asking me to lie, and I'm not comfortable with it, so I did the best that I could for the situation. You told me not to tell. You are my employer. I still work for you. But when this [LHC employee] asked me a direct question, you wanted me to lie. And when I just said, I don't know, I will let you know when I decide, you all are angry. Well, you should haven't told. I said, well, you guys put me in a bad situation. That was the extent of the conversation.

¶23. On February 15, 2011, five employees resigned, including Crystal Miller and Rhonda Smith. Meanwhile, Gulf Coast Hospice had previously contracted with two medical directors. One medical director had provided Gulf Coast Hospice notice that he would no longer serve as a medical director, and the other refused to speak with LHC.

10

¶24.    On February 21, 2011, Dustin sent Harry a wire transfer request form and seller's W-9 form in anticipation of closing.  On February 22, 2011, Dustin sent a draft of the closing statement to Harry.  On February 22, 2011, Wisgoski and a part time employee resigned.  On February 23, 2011, Ingrid Miscavage of Gulf Title Company sent Harry a redlined asset purchase agreement dated "~~1~~2/~~7~~23/2011."  Again, the top of the document read "LHCG Draft" and disclaimed that it was "For Discussion Purposes Only."  The draft agreement included a purchase price of $1.75 million.

¶25.    Around February 24, 2011, Rogers accepted a job with a competing hospice company.  Rogers did not disclose her acceptance to LHC until after the scheduled closing date.  On February 24, 2011, Denton emailed Stagg expressing concerns that Rogers might quit due to her problems with LHC.  Denton stated that she would do her best to retain her and the remaining staff.  On February 25, 2011, Denton emailed LHC employees, informing them that Gulf Coast Hospice RN Gracie Flurry had called to tell her that Rogers and most of the staff planned to walk out on March 1, 2011, and would attempt to take patients with them.  Denton relayed the information provided by Flurry:

> Linda has been giving everyone a very negative image about LHC[], not only within the agency, but in the community and with the doctors as well.  Gracie thinks that the real issue is that Linda is unable to "give up control of her agency[."]  She wants to make sure that the agency falls apart when she leaves.

¶26.    Denton explained Gulf Coast Hospice staff's negative perception of LHC.  Cynthia Wells then emailed Denton, "I know . . . a lot of it is our fault!"  Denton responded to Wells, writing that she "needs to be there frequently following the announcement.  Everyone is

11

screwing up." Denton also expressed concerns that a medical director had not been contracted, a requirement for a hospice to operate.

¶27. LHC became concerned whether, if Rogers were to leave, any patients would remain. Michael Freeman, vice president of acquisitions, emailed Lori, Brach, and Dustin noting the uncertainty surrounding the staff and asked, "Do we push the deal back a month to see what happens and get a better grasp on things?" Stagg responded, "[t]hat might be the best alternative - - - Will Harry hold off for a month?" Dustin responded to Brach, "This is just great. . . Now that all this is going on. . . Of course I just get an email from Nathan saying that he is now confident we can close on Monday!!"

¶28. At LHC's request, on February 28, 2011, Gulf Coast took a poll of employees who would be willing to work for LHC. Patrick Williams, Gulf Coast Hospice's attorney, emailed Dustin a list of ten employees and the chaplain who had stated their intention of remaining with LHC. A new offer was extended to two employees—Schonewitz and Morris—who had been previously advised that they would be laid off following the acquisition. Williams informed Dustin to contact him to discuss the list and wrote that he "[l]ooked forward to working with [Dustin] to resolve this matter."

¶29. LHC refused to close the transaction. LHC maintained that conditions in the letter of intent had not been met. Nonetheless, discussions continued, and LHC hoped to "find a way to press forward without Linda Rogers in the picture." On March 4, 2011, LHC sent to Williams a revised draft asset purchase agreement, containing a noncompetition provision for Rogers. LHC advised that the revised draft purchase agreement "incorporat[ed] those

12

changes discussed amongst the parties earlier today." The draft included a purchase price of $1.75 million, reflecting the additional $25,000 that had been discussed to cover the cost of a bonus payable to Rogers to offset her salary reduction. LHC also advised Williams, "We are still working on the non-compete agreement for Linda Rogers and will get that to you as quickly as possible." The top of the draft asset purchase agreement again read "LHCG Draft" and disclaimed that it was "For Discussion Purposes Only."

¶30. Williams forwarded the revised purchase agreement to Harry and Prasant. The March 4, 2011, draft contained conditions for a noncompetition agreement for Rogers and a patient census minimum. The draft provided a new closing date of March 9, 2011. Williams advised Harry and Prasant that the noncompetition agreement for Rogers did not provide a required time limit. Williams presented a noncompetition agreement to Rogers, but she refused to sign it. On March 21, 2011, acquisition discussions ended. In August 2011, Gulf Coast Hospice was sold for $500,000 to another purchaser. The new purchaser had offered $1.2 million, but ultimately the deal closed for $500,000 because the purchase price had been based on the patient census. At the time of the sale, Gulf Coast Hospice had eleven patients.

¶31. Gulf Coast Hospice sued LHC, asserting the following claims arising out of the unconsummated acquisition: breach of contract; breach and tortious breach of contract; breach and tortious breach of the letter of intent; tortious interference with contracts and business relations; fraud, misrepresentation, and fraudulent inducement; negligent

13

misrepresentation; conspiracy; declaratory judgment; promissory estoppel; detrimental reliance; and unjust enrichment and *quantum meruit*.[6]

¶32. LHC filed a motion for summary judgment on each claim asserted by Gulf Coast Hospice. The trial court granted LHC's motion for summary judgment. The trial court found that the letter of intent clearly provided that before any closing could occur, the parties first had to mutually execute a final asset purchase agreement. The trial court continued, "[i]t is undisputed that no such agreement was executed." The trial court also found that the letter of intent provided that the closing of the transaction was expressly conditioned upon "satisfactory completion of due diligence by LHC[] and its affiliates." The trial court rejected Gulf Coast's argument that due diligence had been completed before LHC's announcement to Gulf Coast Hospice employees, because the letter of intent expressly authorized LHC to "assess the staffing levels" and to identify employees that it wished to hire "[p]rior to [c]losing and as part of the due diligence process." As such, the trial court found that the undisputed terms of the letter of intent contradicted Gulf Coast Hospice's position regarding due diligence.

¶33. Gulf Coast Hospice filed notice of appeal,[7] raising five assignments of error:

1. There was sufficient evidence to support a jury question that LHC and [Gulf Coast Hospice] formed an enforceable contract through words, actions[,] and performance of the parties manifesting intent to do so,

[6] The parties agree that the claims for conspiracy, unjust enrichment, and *quantum meruit* were properly dismissed. Gulf Coast Hospice does not raise the dismissal of the declaratory judgment count as an issue on appeal.

[7] Because LHC's counterclaims against Gulf Coast Hospice remain pending, the trial court entered a final judgment under Mississippi Rule of Civil Procedure 54(b).

even though they previously expressed an intent to be bound only by a written agreement. A written agreement to be bound by a written agreement can be amended by an oral agreement[] if it satisfies the statute of frauds.

2. There was sufficient evidence to support a jury question that even in the absence of a written contract, LHC is estopped from denying the existence of a contract based upon through [sic] words, actions, reliance[,] and performance of the parties.

3. There was sufficient evidence to support a jury question that LHC made intentional and/or negligent misrepresentations or fraudulent inducement for which it may be liable to [Gulf Coast Hospice] for damages.

4. There was sufficient evidence to support a jury question that LHC breached the letter of intent and its duty of good faith.

5. There was sufficient evidence to support a jury question that LHC tortious[ly] interfered with contracts of [Gulf Coast Hospice].

## STANDARD OF REVIEW

¶34. The interpretation of a contract is a question of law that the Court reviews *de novo*. *Coleman & Coleman Enters., Inc. v. Waller Funeral Home*, 106 So. 3d 309, 314 (¶ 10) (Miss. 2012). Likewise, the Court reviews a trial court's grant of summary judgment *de novo*. *Kilhullen v. Kansas City S. Ry.*, 8 So. 3d 168, 174 (¶ 14) (Miss. 2009). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Miss. R. Civ. P. 56(c). Evidence will be viewed in a light most favorable to the nonmoving party. *Kilhullen*, 8 So. 3d at 174-75 (¶ 14).

## DISCUSSION

15

**I.     Whether a jury question exists that LHC and Gulf Coast Hospice formed an enforceable contract through words, actions, and performance of the parties, even though they previously expressed an intent to be bound only by a written agreement.**

¶35.    "It is, of course, a basic principle of the law of contracts that a contract is not formed between the parties absent the essential elements of offer, acceptance, and consideration." *Lagniappe Logistics, Inc. v. Buras*, 199 So. 3d 675, 677 (¶ 7) (Miss. 2016) (quoting *Whiting v. Univ. of S. Miss.*, 62 So. 3d 907, 915 (¶ 14) (Miss. 2011), *overruled on other grounds by Springer v. Ausbern Constr. Co., Inc.*, 231 So. 3d 980 (Miss. 2017)).  "The elements of a contract are (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation."  *GGNSC Batesville, LLC v. Johnson*, 109 So. 3d 562, 565 (¶ 6) (Miss. 2013) (emphasis omitted) (quoting *Adams Cmty. Care Ctr., LLC v. Reed*, 37 So. 3d 1155, 1158 (¶ 7) (Miss. 2010)).

¶36.    "[O]ral contracts are ordinarily no less enforceable than others."  *Putt v. City of Corinth*, 579 So. 2d 534, 538 (Miss. 1991).  Similarly, "[a] contract that arises from the conduct of the parties, also known as a contract implied in fact, has the same legal effect as an express contract."  *Franklin v. Franklin ex rel. Phillips*, 858 So. 2d 110, 120 (¶ 34) (Miss. 2003).  With respect to "agreements to enter into future contracts" the Court has explained as follows:

> A contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement.
>
> However, unless an agreement to make a future contract is definite and certain upon all the subjects to be embraced, it is nugatory.  To be enforceable, a

16

contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations. Where a final contract fails to express some matter, as, for instance, a time of payment, the law may imply the intention of the parties; but where a preliminary contract leaves certain terms to be agreed upon for the purpose of a final contract, there can be no implication of what the parties will agree upon. If any essential term is left open to future consideration, there is no binding contract, and an agreement to reach an agreement imposes no obligation on the parties thereto.

. . . .

It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent documentary agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called contract to make a contract is not a contract at all.

*Etheridge v. Ramzy*, 276 So. 2d 451, 452-53 (Miss. 1973) (internal quotation marks omitted) (citations omitted).

¶37. Gulf Coast Hospice and LHC agree that the letter of intent was "not a binding contract to purchase." The parties also agree that a final asset purchase agreement was never executed and delivered as contemplated by the letter of intent. Certainly, "mere agreements to agree are unenforceable." *Denbury Onshore, LLC v. Precision Welding, Inc.*, 98 So. 3d 449, 453 (¶ 14) (Miss. 2012) (citing *Duke v. Whatley*, 580 So. 2d 1267, 1274 (Miss. 1991)). Therefore, for purposes of the present assignment of error, Gulf Coast Hospice does not contend that the letter of intent constitutes a valid and binding contract to purchase; rather, it contends that sufficient evidence exists creating a jury question that LHC and Gulf Coast

Hospice had formed a binding and enforceable contract through words, actions, and performance beginning with the announcement of February 1, 2011.

¶38.    Generally, "the judicial review and interpretation of a contract involves a three-step analysis." *Epperson v. SOUTHBank*,, 93 So. 3d 10, 16 (¶ 16) (Miss. 2012) (citing *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (¶ 10) (Miss. 2003)). In a summary judgment case, however, the Court need not go through the entire three-step analysis; rather the Court should determine only whether the contract is ambiguous. *Id.* at 17 (¶ 20). Questions of contract construction and ambiguity are questions of law rather than questions of fact. *Id.* If the Court "finds the terms of the contract to be ambiguous or subject to more than one interpretation, the case must be submitted to the trier of fact, and summary judgment is not appropriate." *Id.* (citing *Royer Homes*, 857 So. 2d at 752-53).

¶39.    While the letter of intent is not an enforceable contract *to purchase*, the terms of the letter of intent are otherwise enforceable. Here, the letter of intent is plain and unambiguous. It states that the closing of the transaction will be subject to the satisfaction of mutually agreeable terms and conditions, including the negotiation, execution, and delivery of the satisfactory, definitive asset purchase agreement and any other documents necessary to consummate the proposed transaction. It is undisputed that a satisfactory, definitive asset purchase agreement was never executed. Accordingly, under the plain and unambiguous terms of the letter of intent, no enforceable written contract exists.

¶40.    Gulf Coast urges that "a written contract can be orally modified." *Eastline Corp. v. Marion Apartments, Ltd.*, 524 So. 2d 582, 584 (Miss. 1988) (citing *St. Louis Fire & Marine*

18

*Ins. Co. v. Lewis*, 230 So. 2d 580 (Miss. 1970)). The oral *modification* rule is inapplicable here because, other than the letter of intent, no prior agreement between the parties existed to be *modified*. As noted above, "[i]f the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract to make a contract' is not a contract at all." *Etheridge*, 276 So. 2d at 454 (quoting 1A Corbin, *Contracts* § 29, at 84-85 (1963)).

¶41. Gulf Coast mentions a portion of Harry's testimony in its statement of facts, purporting to show the existence of an oral contract. Harry testified that on the day of the announcement of February 1, 2011, an unknown vice president of LHC assured Harry that the "deal was done." As far as Harry was concerned,

> As a businessman, anybody can understand, when somebody comes to your door and they say, the deal is done, shake hands to you, tell other people the deal is done, the deal is done. There's nothing else to discuss that matters. That's what they convince us. Check over the bank balance. What other thing is? The deal is done. There's no negotiation. There is no other paper work, except on closing date, we are going to sign the document and transfer the money by wire transfer. That's all to it. And it's a straightforward deal.

¶42. The Court has written that "[t]he existence of an oral contract is a fact issue." *WRH Props., Inc. v. Estate of Johnson*, 759 So. 2d 394, 396 (¶ 12) (Miss. 2000) (citing *Harris v. Williams*, 43 So. 2d 364, 365 (Miss. 1949)). Harry's unilateral decision that the acquisition was complete on February 1, 2011, and his claim that nothing remained to be negotiated is simply not supported by the record. Although Harry testified that due diligence was done, "as far as [he] kn[e]w," the record shows that after the announcement, LHC's HR team performed onsite due diligence by meeting with prospective employees and extending offer

19

letters. Thus, the record unequivocally shows that due diligence continued after the announcement and acquisition negotiations continued throughout the entire month of February and into March.

¶43. While the potential existence of an oral contract might present a fact issue, unless the party challenging summary judgment produces sufficient evidence demonstrating that a disputed material fact exists, summary judgment remains proper. Harry's testimony, in context, does not support a finding of mutual assent necessary to the existence of an oral contract. Rather than emphasizing Harry's testimony in support of the assignment of error, Gulf Coast Hospice's chief position is that LHC's conduct onsite, beginning with the announcement of February 1, 2011, was "evidence of mutual assent to close on February 28[th]." To the extent that Gulf Coast Hospice asks the Court to enforce an agreement to close, the argument fails as a matter of law. *See **Denbury***, 98 So. 3d at 453 (¶ 14) (holding that mere agreements to agree are unenforceable).

¶44. In the case *sub judice*, the letter of intent sets forth the parties' mutual understandings with respect to the basic terms of a proposed acquisition. The letter of intent provides that parties share a "mutual intent to negotiate a satisfactory definitive asset purchase agreement" as well as "such other documents as may be necessary to consummate the proposed transaction." The letter of intent unequivocally provided that "[a] binding commitment with respect to the [t]ransaction will result only if the [a]greements are executed and delivered[] and are then subject only to the terms and conditions contained therein." The letter of intent

also generally outlined the course of conduct expected in negotiating a satisfactory, definitive asset purchase agreement. The letter of intent did not contain an expiration date.

¶45. "If either party communicates an intent not to be bound until he achieves a fully executed document, no amount of oral agreement to specific terms will result in the formation of a binding contract." *Knight v. Sharif*, 875 F.2d 516, 525 (5th Cir. 1989) (internal quotation marks omitted) (quoting *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1986)). "The importance of the parties' expression of an intent not to be bound is manifest." *Knight*, 875 F.2d at 525. "Courts should not frustrate the parties' expressed intent." *Id.*

¶46. The letter of intent unequivocally communicates an intent not to be bound until a definitive asset purchase agreement and such other documents necessary to consummate the proposed transaction were executed and delivered. Harry, who handled the negotiations for Gulf Coast Hospice, confirmed that "the intention was for neither Gulf Coast Hospice [n]or LHC to be bound by a definitive agreement, like a purchase agreement, until it was executed." *See **King's Daughters and Sons Circle No. Two of Greenville v. Delta Reg'l Med. Ctr.***, 856 So. 2d 600, 607 (¶ 23) (Miss. Ct. App. 2003).

¶47. In *King's Daughters*, Quorum, a national hospital company, sought to acquire King's Daughters Hospital. *Id.* at 602-03, 606 (¶¶ 3, 5, 22). The Court of Appeals, in addressing a third party hospital's tortious interference claim, wrote,

> The record reflects, through depositions, that Quorum's senior vice president and its vice president both admitted that critical items of the purchase and sale of King's Daughters, such as the purchase price, remained to be resolved after the execution of the letter of intent. Quorum's officers did not consider the

21

letter of intent to be a final agreement, and they believed that, until Quorum's due diligence was complete, material terms of the final contract (such as the purchase price) were yet to be determined. In Quorum's view, and consistent with the letter of intent, there was no agreement until the final purchase document was executed.

*Id.* at 607 (¶ 23). The Court of Appeals held that the letter of intent between King's Daughters and Quorum was a contract to make a contract and not the sort of final contract necessary to support a tortious interference claim. ***Id.***

¶48. Gulf Coast Hospice cites ***Edwards v. Wurster Oil Co.***, 688 So. 2d 772, 775 (Miss. 1997), in support of its argument that a party may consent to an agreement through actions showing assent, as well as through words. In ***Edwards***, the Court wrote that "[i]t is a well-settled principle of law that 'acceptance of a contract as binding upon a party may be shown by his actions, and any definite and unequivocal course of conduct disclosing that the party has acceded or assented to it, is as binding on him as had he endorsed his assent in formal writing[.]'" ***Id.*** (quoting ***Fanning v. C.I.T. Corp.***, 52 So. 41, 43 (Miss. 1939)).

¶49. The present case differs from ***Edwards*** because no definite and unequivocal course of conduct exists showing that LHC had assented to a final definitive agreement. Also, in ***Edwards***, the Court noted that the conduct at issue had occurred "after receiving the documents showing all of the terms[.]" In contrast, no agreement in the record here contains all of the terms agreed to by the parties. Indeed, the alleged conduct constituting acceptance was performed while the parties were in the process of exchanging draft asset purchase agreements.

¶50.    In *WRH Properties*, the Court addressed whether individual parties had entered into a binding settlement agreement during a telephone conversation.  *WRH Props.*, 759 So. 2d at 396 (¶ 12).  The Court reviewed the conversation and concluded, "Th[e] langauge indicate[d] that Kathy and Rusty may have reached an agreement in principle, but it was obvious that the lawyers would have to eventually work out the details.  Those details were never worked out."  *Id.* at 397 (¶ 14).  The Court applied the following principles in determining whether an enforceable agreement had been reached:

> Whether contracting parties are bound by an informal agreement prior to the execution of a contemplated formal writing is a matter of intention to be determined by the surrounding facts and circumstances of each particular case.  Certain circumstances have been suggested as helpful for determining such an intention, as, for example: (1) whether the contract is usually one put in writing; (2) whether there are few or many details; (3) whether the amount involved is large or small; (4) whether it requires a formal writing for a full expression of the covenants and promises; and (5) whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations.

*Id.* (internal quotation marks omitted) (quoting *Mid-Continent Tel. Corp. v. Home Tel. Co.*, 319 F. Supp. 1176, 1189 (N.D. Miss. 1970)).

¶51.    The Court held that each circumstance had occurred and reversed the trial court's judgment finding that an enforceable agreement had been reached by the parties.  *WRH Props.*, 759 So. 2d at 397 (¶ 19).  The Court explained that it "can come to no other conclusion other than [the parties] intended that their agreement in principle be reduced to writing before it was binding."  *Id.* at 397 (¶ 18).

¶52.    In the case *sub judice*, each of the factors must be answered in favor of LHC.  The draft asset purchase agreements were in writing, the drafts contained many details, the initial

23

proposed purchase price was $1.75 million, the letter of intent required a formal writing for a full expression of the covenants and promises, and the negotiations themselves indicate that a written draft was contemplated as the final conclusion of the negotiations. *See id.* The Court can come to no other conclusion than LHC and Gulf Coast Hospice intended that the purchase agreement be reduced to writing before it was binding. *See id.*

¶53. "Continual redrafting of the specific terms of a proposed agreement, as here, is a clear indicator of the importance of the provisions and the parties' intention to be bound only by the final execution and consummation of the agreement." *Knight*, 875 F.2d at 524 (citing *Winston*, 777 F.2d at 82-83)). The United States Court of Appeals for the Fifth Circuit cautioned against "the potential tyranny of courts in forcing contracts upon parties which they were not willing to make for themselves." *Knight*, 875 F.2d at 524. The Fifth Circuit warned,

> Parties that wish to be bound only upon execution of a formal document agree to negotiate in that manner [i.e. constant redrafting] because they wish to create a writing that is satisfactory to both sides in every respect. It is not for the Court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so "minor" or "technical" that the contract was binding despite the parties' unwillingness to have it executed and delivered. For the court to do so would deprive the parties of their right to enter into only the exact contract they desired.

*Id.* at 524 (alteration in original) (quoting *Winston*, 777 F.2d at 83).

¶54. If "a preliminary agreement leaves open any material term to be agreed upon in the final contract, 'there can be no implication of what the parties will agree upon.'" *Knight*, 875 F.2d at 525 (quoting *S. Miss. Elec. Power Ass'n v. Delhi Gas Pipeline Corp.*, 436 F. Supp. 244, 257 (S.D. Miss. 1977)). Recognizing that the four page letter of intent omitted

24

a host of material terms to be agreed upon, Gulf Coast Hospice claims that the unexecuted closing documents sent on January 7, 2011, constitute the terms of the alleged agreement reached between the parties. Essentially, Gulf Coast Hospice asks the Court to enforce unexecuted closing documents containing terms and conditions and schedules in excess of one hundred pages—documents LHC refused to execute. Gulf Coast Hospice attempts to justify the enforcement of the closing documents of January 7, 2011, arguing that "[e]xcept for a modification requested by LHC, the material terms never changed." The modification was the $25,000 bonus to be paid to Rogers.

¶55.    "Th[e] Court has long recognized that an agreement must be definite and certain in order to be enforceable." *Etheridge*, 276 So. 2d at 455. The Court has explained,

> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
>
> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

*Id.* at 455 (quoting Restatement (Second) of Contracts § 32 (Am. Law Inst., Tentative Draft No. 1, 1964)).

¶56.    Here, the terms of an agreement to purchase Gulf Coast Hospice's operations are not reasonably certain. One or more terms of the proposed bargain were left open and uncertain, showing that a manifestation of intention was not intended to be understood as an offer or as an acceptance. *See id.* The letter of intent provides that "[t]he intention to consummate

25

the transaction" was subject to certain "terms and conditions." Perhaps most importantly, a final purchase agreement—a necessary condition for consummation of the transaction—was never executed or delivered in a final form. As such, no satisfactory contract exists.

¶57. LHC also points to other material conditions in the draft purchase agreements that had not been satisfied, including the requirement that the patient census level be consistent with the average Medicare census of Gulf Coast Hospice for the prior twelve months. Gulf Coast Hospice confirms the significance of the material condition, stressing that the patient census is "a hospic[e's] life blood[.]" Indeed, Gulf Coast Hospice explains that "[t]he value of a hospice is tied to its patient census," and "[a] strong census requires good employees and a healthy referral network." Moreover, the draft purchase agreement, like paragraph five of the letter of intent, requires that LHC be "reasonably satisfied" with the results of its due diligence investigation.

¶58. While Gulf Coast Hospice claims LHC's conduct following the announcement evidences an agreed upon contract, Gulf Coast Hospice's own conduct evidences that a valid and binding contract never existed. Gulf Coast Hospice continued to exchange draft purchase agreements through February and into March 2011. The trial court correctly concluded that "[t]he draft asset purchase agreement is not an enforceable contract[; i]t was never executed."

**II. Whether a jury question exists that, even in the absence of a written contract, LHC is estopped from denying the existence of a contract with Gulf Coast Hospice based upon words, actions, reliance, and performance.**

26

¶59. The doctrine of estoppel "is defined generally as the principle by which a party is precluded from denying any material fact, induced by his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed." ***Koval v. Koval***, 576 So. 2d 134, 137 (Miss. 1991). "Equitable estoppel . . . prevents a party from embracing the benefits of a contract while simultaneously trying to avoid its burdens." ***Cmty. Bank of Miss. v. Stuckey***, 52 So. 3d 1179, 1183 (¶ 25) (Miss. 2010).

¶60. "However, estoppel should only be used in exceptional circumstances and must be based on public policy, fair dealing, good faith, and reasonableness. ***Powell v. Campbell***, 912 So. 2d 978, 982 (¶ 12) (Miss. 2005) (citing ***PMZ Oil Co. v. Lucroy***, 449 So. 2d 201, 206 (Miss. 1984)). "The law does not regard estoppels with favor, nor extend them beyond the requirements of the transactions in which they originate." ***Lucroy***, 449 So. 2d at 206 (quoting ***McLearn v. Hill***, 177 N.E. 617, 619 (Mass. 1931)).

¶61. The essential elements of equitable estoppel are

> Conduct and acts, language or silence, amounting to a representation or concealment of material facts, with knowledge or imputed knowledge of such facts, with the intent that representation or silence, or concealment be relied upon, with the other party's ignorance of the true facts, and reliance to his damage upon the representation or silence.

***Rawls Springs Util. Dist. v. Novak***, 765 So. 2d 1288, 1292 (¶ 12) (Miss. 2000) (quoting ***Chapman v. Chapman***, 473 So. 2d 467, 470 (Miss. 1985)). "A party asserting equitable estoppel must show (1) that he has changed his position in reliance upon the conduct of another and (2) that he has suffered detriment caused by his change of his position in reliance

upon such conduct." ***Lucroy***, 449 So. 2d at 206 (citing ***Birmingham v. Conger***, 222 So. 2d 388, 392-93 (Miss. 1969)). "[I]t must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done, and which has resulted to his harm and that the other knew or had reasonable cause to know that such consequence might follow." ***Id.*** (quoting ***McLearn***, 177 N.E. at 619).

¶62. "Promissory estoppel differs from ordinary equitable estoppel in that the representation is promissory rather than as to an existing fact." ***Old Equity Life Ins. Co. v. Jones***, 217 So. 2d 648, 652 (Miss. 1969) (citing 31 C.J.S. *Estoppel* § 80 (1964)).

> [A]n estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetuation of fraud or would result in other injustice.

***C. E. Frazier Constr. Co. v. Campbell Roofing & Metal Works, Inc.***, 373 So. 2d 1036, 1038 (Miss. 1979) (alteration in original) (quoting 28 Am. Jur. 2d *Estoppel and Waiver*, at 548 (1966)).

¶63. Mississippi law recognizes that the doctrine of promissory estoppel does not prevent a party who has made a representation from changing his intention in the future when, as here, the party considers information acquired after the representation. *See e.g.*, ***Suddith v. Univ. of S. Miss.***, 977 So. 2d 1158, 1181 (¶ 54) (Miss. Ct. App. 2007) (quoting ***Cook v. Farley***, 15 So. 2d 352, 357 (Miss. 1943)). In ***Suddith***, the Court of Appeals held that Dr. Auberey Lucas was not estopped from considering after acquired information about John Suddith's affair with a student when Dr. Lucas had originally intended to recommend Suddith for a tenure-track position.

28

¶64. Gulf Coast Hospice's estoppel claim, whether equitable or promissory, is barred by the express terms of the letter of intent. The letter of intent sets out the mutual understandings of the parties. Although the letter of intent does not enumerate each and every specific action that might be performed as part of the due diligence process, the broad and unambiguous language allowed LHC to assess staffing levels; to identify employees LHC wanted to retain after closing; to review Gulf Coast Hospice's operations, business, assets, liabilities, financial condition, properties, books, and records; to make public announcements; and to conduct any other satisfactory due diligence "as may be reasonable and customary in acquisition agreements" before closing. The letter of intent allowed LHC to perform tasks that were required to ensure that no lapse in service would occur upon a change in ownership. Gulf Coast Hospice and LHC agreed that "[e]ach party bear its own expenses arising out of this letter and the Transaction, with no liability for such expenses to any other party, whether or not the Transaction or any part thereof shall close."

¶65. The facts presented in the present case do not contain exceptional circumstances that would necessitate the application of the estoppel doctrine. The parties expressly agreed that a condition of closing would be subject to the negotiation, execution, and delivery of a satisfactory, definitive asset purchase agreement and such other documents necessary to consummate the proposed transaction.

III. **Whether a jury question exists about intentional misrepresentations, fraudulent inducement, or negligent misrepresentations.**

¶66. Gulf Coast Hospice contends that sufficient evidence supported the existence of a jury question that LHC made intentional misrepresentations, fraudulent inducements, or,

29

alternatively, negligent misrepresentations. Stated differently, Gulf Coast Hospice claims that LHC conveyed its intent to close and induced Gulf Coast Hospice to rely to its detriment; "[a]ll the while, it secretly harbor[ed] the position that it could repudiate the transaction on the closing date based on damage it caused to the hospice."

## A. Fraud, Intentional Misrepresentation, and Fraudulent Inducement

¶67. To prove fraud, a plaintiff must prove by clear and convincing evidence:

> 1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of its falsity or ignorance of its truth; 5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; 6) the hearer's ignorance of its falsity; 7) his reliance on its truth; 8) his right to rely thereon; and 9) his consequent and proximate injury.

*Levens v. Campbell*, 733 So. 2d 753, 761-62 (¶ 35) (Miss. 1999) (citing *Martin v. Winfield*, 455 So. 2d 762, 764 (Miss. 1984)). "In order to establish fraudulent misrepresentation, the elements of fraud must be proven." *Id.* at 762 (¶ 35) (citing *Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (Miss. 1992)).

¶68. Gulf Coast Hospice contends that, beginning with the February 1, 2001, announcement, LHC represented to Gulf Coast Hospice, including its members and employees, that it was acquiring Gulf Coast Hospice effective March 1, 2011. Gulf Coast Hospice contends that LHC's continued investigation of whether to acquire Gulf Coast Hospice renders its representations false.

¶69. "Th[e] Court has made it clear that even in cases where fraud is alleged, a promise of future conduct does not meet the requirement of a 'representation' unless the promise was made with the present intent not to perform[.]" *Bank of Shaw v. Posey*, 573 So. 2d 1355,

1360 (Miss. 1990) (citing *McMullan v. Geosouthern Energy Corp.*, 556 So. 2d 1033, 1037 (Miss. 1990)).

¶70.   At the time of the announcement, it is undisputed that LHC intended to acquire Gulf Coast Hospice.  Put simply, no evidence exists suggesting that LHC did not intend to complete the transaction *at the time* of the announcement.  Even when employees became disgruntled with proposed compensation changes, LHC remained committed to negotiating a satisfactory transaction.

¶71.   On Friday, February 25, 2011, LHC learned that Rogers and most of Gulf Coast Hospice's employees were planning to walk out and take their patients with them on the scheduled effective date of the acquisition, March 1, 2011.  In light of the newly acquired information, LHC decided not to close the transaction with Gulf Coast Hospice on Monday, February 28, 2011.  Although LHC refused to close, LHC attempted to salvage the transaction beyond the initially scheduled closing date.  In light of the new developments concerning Rogers and other staff, LHC sought to protect the asset it planned to purchase by incorporating a noncompetition agreement to be signed by Rogers.  Rogers refused, and negotiations ultimately ended.  Gulf Coast Hospice fails to present sufficient evidence that LHC made a representation with present intent not to perform.

¶72.   Gulf Coast Hospice's fraudulent inducement claim likewise fails. "Generally, fraud in the inducement 'arises when a party to a contract makes a fraudulent misrepresentation, i.e., by asserting information he knows to be untrue, for the purpose of inducing the innocent party to enter into a contract.'" *Virginia Coll., LLC v. Blackmon*, 109 So. 3d 1050, 1053 (¶

31

10) (Miss. 2013) (quoting *Lacy v. Morrison*, 906 So. 2d 126, 129 (¶ 6) (Miss. Ct. App. 2004)). Not only did Gulf Coast Hospice fail to show a fraudulent misrepresentation, LHC did not induce Gulf Coast Hospice to enter into a contract. As discussed above, no binding and enforceable contract to purchase exists.

### B. Negligent Misrepresentation

¶73. To show negligent misrepresentation, the following elements must be proved:

> (1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.

*Horace Mann Life Ins. Co. v. Nunaley*, 960 So. 2d 455, 461 (¶ 20) (Miss. 2007) (citing *Skrmetta v. Bayview Yacht Club, Inc.*, 806 So. 2d 1120, 1124 (Miss. 2002)).

¶74. Again, "the first element of negligent misrepresentation, misrepresentation of a fact, must concern a past or present fact as contrasted with a promise of future conduct." *Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (emphasis omitted) (citing *Bank of Shaw*, 573 So. 2d at 1360). Gulf Coast Hospice fails to show that LHC made a representation with the present intent not to perform. *See Posey*, 573 So. 2d at 1360 (holding that "a future promise does not qualify as an existing material fact under the elements of negligent misrepresentation." (citing *Margrove Inc. v. Lincoln First Bank of Rochester*, 54 A.D. 2d 1105 (N.Y. App. Div. 1976))). LHC's statement that it intended to acquire Gulf Coast and that it remained committed to the acquisition does not constitute an existing material fact.

32

Put simply, LHC's future promise was a promise to negotiate a satisfactory definitive asset purchase agreement. LHC did so even after it discovering the planned staff walkout.

**IV.    Whether a jury question exists about whether LHC breached the letter of intent and duty of good faith.**

¶75.    Gulf Coast Hospice argues that sufficient evidence exists supporting a jury question about whether LHC breached the letter of intent and its duty of good faith and fair dealing.

### A.    Breach of the letter of intent

¶76.    Gulf Coast Hospice claims that, while it permitted LHC to conduct due diligence, LHC's conduct beginning with the announcement of February 1, 2011, was not authorized by the letter of intent. Gulf Coast Hospice does not direct the Court's attention to any portion of the letter of intent that was allegedly breached. Gulf Coast Hospice simply makes a bald assertion that LHC's conduct beginning with the announcement of February 1, 2011, constituted a breach of the letter of intent.

¶77.    "A breach-of-contract case has two elements: (1) 'the existence of a valid and binding contract,' and (2) a showing 'that the defendant has broken, or breached it.'" *Maness v. K & A Enterprises of Miss., LLC*, 250 So. 3d 402, 414 (¶ 43) (Miss. 2018) (quoting *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1224–25 (¶ 10) (Miss. 2012)). While it is undisputed that the letter of intent was not a valid and binding contract *to purchase*, the letter of intent set forth the mutual understandings with respect to the basic terms of the proposed acquisition. The letter of intent provided that the mutual intent of the

33

parties was to negotiate a satisfactory definitive asset purchase agreement and any other documents necessary to consummate the proposed transaction.

¶78.   The letter of intent contained a provision regarding public announcements:

> **Public Announcements**. Subject to requirements of law, LHC[], [Gulf Coast Hospice,] and any of their respective affiliates, agents or employees shall not issue any news releases or other announcements pertaining to this letter or the transactions contemplated herein prior to the Closing without the consent of the non-disclosing party, such consent not to be unreasonably withheld.

¶79.   Harry's testimony belies Gulf Coast Hospice's assertion that LHC's onsite announcement was not permitted, because he testified that he consented to the announcement. Moreover, nothing in the record supports Gulf Coast Hospice's claim that LHC's activities onsite following the announcement were unauthorized. Not only were the activities authorized, the activities were contemplated and were set forth within the letter of intent.

¶80.   Gulf Coast Hospice executed the letter of intent, accepting and agreeing to the conduct, including: (1) a pre-closing assessment of staffing levels and the transitioning of employees to LHC; (2) the satisfactory completion of due diligence of all aspects of Gulf Coast Hospice; (3) the negotiation, execution, and delivery of agreements necessary to consummate the transaction, such as a purchase agreement, medical director contracts, and vendor contracts; and (4) the receipt of necessary consents and approvals from the government and third parties. Because LHC acted with Gulf Coast Hospice's consent and in accordance with the terms of the letter of intent, Gulf Coast Hospice's breach of contract claim fails.

## B. Breach of the duty of good faith and fair dealing

¶81. The Court has held that "[a]ll contracts contain an implied covenant of good faith and fair dealing in performance and enforcement." *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992) (citing *Morris v. Macione*, 546 So. 2d 969, 971 (Miss. 1989)). "The duty of good faith and fair dealing arises from the existence of a contract between parties[.]" *Am. Bankers' Ins. Co. of Fla. v. Wells*, 819 So. 2d 1196, 1207 (¶ 35) (Miss. 2001) (emphasis omitted) (citing *Cenac*, 609 So. 2d at 1272).

¶82. The duty is based upon fundamental notions of fairness and its scope necessarily varies according to the nature of the agreement. *Cenac*, 609 So. 2d at 1273. "Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party." *Id.* Bad faith "requires a showing of more than bad judgment or negligence; rather, [it] implies some conscious wrongdoing 'because of dishonest purpose or moral obliquity.'" *Univ. of S. Miss. v. Williams*, 891 So. 2d 160, 170-71 (¶ 24) (Miss. 2004) (quoting *Bailey v. Bailey*, 724 So. 2d 335, 338 (¶ 9) (Miss. 1998)).

¶83. Because no binding and enforceable contract to purchase exists, Gulf Coast Hospice's claim of breach of good faith and fair dealing with respect to an agreement to purchase is necessarily without merit. *See Wells*, 819 So. 2d at 1207 (¶¶ 35-37) (holding that evidence of unfair and inequitable conduct is insufficient to support recovery when a lack of any contractual relationship exists).

¶84. Essentially, Gulf Coast Hospice frames its bad faith claim with respect to the letter of intent as a claim for intentional and fraudulent misrepresentation. As discussed above,

35

Gulf Coast Hospice's misrepresentation claims are without merit. Notwithstanding Gulf Coast Hospice repetitive argument, no breach of implied covenant of good faith and fair dealing with respect to the letter of intent exists. Again, LHC's actions, beginning with the announcement, were contemplated and authorized by Gulf Coast Hospice. A party has not breached the implied covenant of good faith and fair dealing when the party only took actions duly authorized by contract. *See Limbert v. Miss. Univ. for Women Alumnae Ass'n, Inc.*, 998 So. 2d 993, 999 (¶ 14) (Miss. 2008) (holding that a party to a contract "could not have acted in bad faith when she exercised a contractual right").

¶85. Gulf Coast Hospice fails to present sufficient evidence demonstrating a jury question that LHC acted in bad faith by exercising its right to refuse to close the transaction under the letter of intent.

**V.      Whether a jury question exists that LHC tortiously interfered with contracts of Gulf Coast Hospice.**

¶86. Gulf Coast Hospice argues that sufficient evidence existed to create a jury question that LHC tortiously interfered with Gulf Coast Hospice's contracts and business relations.

**A.      Tortious interference with contracts**

¶87. Gulf Coast Hospice does not differentiate between the alleged torts, but tortious interference with the performance of a contract differs from tortious interference with business relations. *See Cenac*, 609 So. 2d at 1268. The Court defined the tort of wrongful interference as follows:

> An action for interference with contract will ordinarily lie when a defendant maliciously interferes with a valid and enforceable contract, thereby causing one party not to perform and resulting in injury to the other contracting party.

36

> Malice in this context is the intentional doing of a harmful act without justification or excuse, or stated differently, the wilful violation of a known right.

*Cenac*, 609 So. 2d at 1268 (quoting *Mid-Continent Tel. Corp.*, 319 F. Supp. at 1199-1200).

¶88.    To establish a claim for tortious interference with a contract, a party must show (1) "that the acts were intentional and willful;" (2) "that they were calculated to cause damage to the plaintiffs in their lawful business;" (3) "that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and" (4) "that actual damage and loss resulted." *Cenac*, 609 So. 2d at 1268-69 (quoting *Liston v. Home Ins. Co.*, 659 F. Supp. 276, 281 (S.D. Miss. 1986)). "It must also be proven that the contract would have been performed but for the alleged interference." *Levens v. Campbell*, 733 So. 2d 753, 761 (¶ 27) (Miss. 1999) (citing *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998)).

¶89.    In order to pursue a cause of action for tortious interference with a contract, "it is accepted that the wrongdoer is a 'stranger' to the contract which was interfered with—an outsider." *Cenac*, 609 So. 2d at 1269.  Therefore, "[a] party to a contract cannot be charged with interfering with his own contract." *Id.* (quoting *Knight*, 875 F.2d at 526). To the extent that Gulf Coast Hospice claims that LHC interfered with the consummation of its own contract to purchase Gulf Coast Hospice, the claim is without merit because LHC cannot be charged with interfering with its own contract. *See id.*

¶90.    The Court has held that a claim for tortious interference with at-will contracts of employment are viable. *Levens*, 733 So. 2d at 760–61 (¶ 27) (Miss. 1999).  "[T]he

37

interference complained of must be wrongful in order to be actionable and . . . any interference is not wrongful and actionable if undertaken by someone in the exercise of legitimate interest or right, which constitutes 'privileged interference.'" *Vestal v. Oden*, 500 So. 2d 954, 957 (Miss. 1986) (quoting *Irby v. Citizens Nat'l Bank of Meridian*, 121 So. 2d 118, 119 (Miss. 1960)). "[E]ven if a party interferes with the formation or execution of a contract, if he has legitimate interest therein or a contractual right to perform said act it is privileged and thus not wrongful and actionable." *Id.* at 957 (emphasis omitted).

¶91. Assuming enforceable employment contracts existed between Gulf Coast Hospice and its employees, LHC's conduct is not actionable because LHC had a legitimate interest in the continued employment of certain employees of Gulf Coast Hospice so that hospice operations would continue without disruption on the scheduled effective date. The letter of intent provides a provision regarding employees:

> **Employees**. Prior to Closing and as part of the due diligence process, LHC[] will assess the staffing levels needed by [LHC] following the Closing and identify for [Gulf Coast Hospice] those employees that LHC[] wishes to hire. [Gulf Coast Hospice] will assist LHC[] in negotiating with and transitioning those employees to the employment of LHC[] for the provision of services to [LHC]. [Gulf Coast Hospice] will retain all liabilities relating to employment related matters which relate to operation of the Business prior to Closing or which relate to the consummation of the Transaction.

¶92. Pursuant to the letter of intent, Gulf Coast Hospice agreed to allow LHC to assess staffing levels and to issue offer letters as part of the due diligence process. According to Harry, no Gulf Coast Employee was terminated at the direction of LHC. Harry instructed Rogers not to terminate anyone "until [LHC] ha[d] taken over." Harry confirmed that he

38

understood that Gulf Coast Hospice would retain all liabilities related to the employment related matters.

¶93.   Certainly, LHC had a legitimate interest in Rogers' continued employment with LHC. The record demonstrates that Rogers was the most valuable employee to Gulf Coast Hospice and that she had been instrumental in its rapid growth.  Rogers did not shy away from proclaiming her success to LHC representatives.  When LHC discovered that Rogers and other disgruntled employees planned to walk out after the acquisition had closed, LHC had a legitimate interest in refusing to close the transaction, because the hospice operations had dramatically changed from the operations LHC had intended to acquire.

¶94.   Even after the planned walkout was discovered, LHC attempted to preserve the transaction by ensuring that Rogers would be subject to a noncompetition agreement, undoubtedly a legitimate business concern in the industry.  Gulf Coast Hospice confirms the importance of employees, their relationships to patients, and potential competition.  Gulf Coat Hospice explains that "[p]atients often choose to follow their care givers."  Gulf Coast Hospice represents that the "phenomenon is well-understood in the industry."  Like LHC's legitimate interest in Gulf Coast employees, LHC possessed a legitimate interest in the contracts between Gulf Coast Hospice and its medical directors.  LHC explained that an executed contract with a medical director is a requirement for hospice operations.  As such, any alleged interference with the medical directors' contracts was privileged, and thus, was not wrongful or actionable.  Gulf Coast Hospice fails to present sufficient evidence demonstrating a jury issue.

### B. Tortious interference with business relations

¶95.    Although tortious interference with contracts claims differ from tortious interference with business relations claims, Gulf Coast Hospice does not distinguish nor does it attempt to elaborate on its bare claim that LHC "interfered with contracts and business relationships." In contrast to tortious interference with contracts, tortious interference with business relations "exists where one engages in some act with a malicious intent to interfere and injure the business of another, and the injury does in fact result." *Cenac*, 609 So. 2d at 1271. "The remedy for the tort is damages, and the plaintiff must also show (1) a loss, and (2) that the defendant's conduct caused the loss." *Id.* (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 130, at 1005-14 (5th ed. 1984)).

¶96.    Gulf Coast Hospice's argument under the present assignment of error is entirely focused on tortious interference with contracts. Notwithstanding, Gulf Coast Hospice has failed to present sufficient evidence showing that LHC acted with malicious intent to interfere and injure its business. Each of LHC's actions with respect to preparing Gulf Coast Hospice for the acquisition on the scheduled effective date was done with a legitimate purpose. *See Progressive Cas. Ins. Co. v. All Care, Inc.*, 914 So. 2d 214, 219 (¶ 7) (Miss. Ct. App. 2005) ("[C]onduct related to a legitimate, employment-related objective constitutes justifiable acts, which cannot 'give rise to an inference of malice.'" (citing *Hopewell Enters., Inc. v. Trustmark*, 680 So. 2d 812, 818-19 (Miss. 1996)).

¶97.    We discern no malice from LHC's conduct, because LHC fully intended to acquire Gulf Coast Hospice until it learned of the planned walkout and, even then, it attempted to

salvage the transaction by continuing to negotiate. Gulf Coast Hospice failed to present sufficient evidence demonstrating a jury issue in support of its tortious interference with business relations claim.

## CONCLUSION

¶98. For the reasons explained above, the Court affirms the trial court's judgment.

¶99. **AFFIRMED.**

**RANDOLPH, C.J., MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J. GRIFFIS, J., NOT PARTICIPATING.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶100. Because I would find that sufficient evidence existed to support a jury question regarding whether Louisiana Hospice Corporation (LHC) and Gulf Coast Hospice formed an enforceable contract through words, actions, and performance of the parties, I respectfully dissent.

¶101. This Court reviews the grant or denial of a motion for summary judgment de novo and views the evidence "in the light most favorable to the party opposing the motion." *Estate of Hudson v. Yazoo City, Miss.*, 246 So. 3d 872, 876 (Miss. 2018) (citing *City of Magee v. Jones*, 161 So. 3d 1047, 1049 (Miss. 2015)). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ." M.R.C.P. 56(c).

¶102. Gulf Coast Hospice asserted that it is entitled to relief under the doctrines of equitable estoppel, promissory estoppel, and detrimental reliance. "A party asserting equitable estoppel must show (1) that he has changed his position in reliance upon the conduct of another and (2) that he has suffered detriment caused by his change of his position in reliance upon such conduct." *PMZ Oil Co. v. Lucroy*, 449 So. 2d 201, 206 (Miss. 1984) (citing *Birmingham v. Conger*, 222 So.2d 388, 392–393 (Miss. 1969). Equitable estoppel "has its roots in the morals and ethics of our society." *Id.*

¶103. I would find that Gulf Coast Hospice presented sufficient evidence to create a question of fact regarding whether LHC's conduct induced Gulf Coast Hospice to change its position and whether Gulf Coast Hospice suffered detriment in reliance upon that conduct. The record shows that in December 2010, LHC and Gulf Coast Hospice executed a Letter of Intent (LOI) in which LHC stated it intended to pay $1,750,000 for the acquisition of Gulf Coast Hospice. The closing was set to occur on February 28, 2011, with a target effective date of March 1, 2011.

¶104. On January 7, 2011, LHC sent Gulf Coast Hospice the proposed Asset Purchase Agreement, which contained the terms of the agreement reached by the parties. Outside of the addition of a bonus for Linda Rogers, the documents reflected the agreement of the parties, subject to the completion of due diligence by LHC. The same day, LHC also sent a change-of-ownership notification to the Mississippi State Department of Health's Health Facilities, Licensure, and Certification Division, stating it was a "formal notification that effective March 1, 2011, [LHC] will be purchasing" Gulf Coast Hospice.

¶105. On February 1, 2011, LHC's head managers announced to the staff of Gulf Coast Hospice that LHC intended to acquire Gulf Coast Hospice on March 1. LHC began discussing with Gulf Coast Hospice staff members which employees would be retained and which employees would be fired. LHC ran background checks on the employees and discussed which employees would have reduced salaries and mileage cuts and which employees would have to be dropped down to part-time hours. As a result, the majority of Gulf Coast Hospice's employees resigned. Rogers stated that she advised LHC not to adjust the employees' pay scales, because the employees had been loyal with their current salaries.

¶106. Moreover, after the announcement, LHC gained access to and copied patient charts. LHC replaced Gulf Coast Hospice's telephone system and changed its telephone providers. LHC replaced the computers, had new computer systems installed, and took over the computer network. LHC hooked the computers up to their nationwide network system, set up email accounts for all of the employees, and issued name tags to the employees. LHC contacted Medline, a medical products distributor, and changed the contract to LHC's name. Additionally, LHC changed the pest control contract, scheduled the utility services to change on March 1, installed photocopiers and fax machines, and changed the phone numbers to switch to LHC ownership. LHC even changed the wiring in the building. Harry Desai stated that LHC already had begun acting as if it had bought Gulf Coast Hospice.

¶107. On February 21, 2011, LHC sent an email to Gulf Coast Hospice stating, "[i]n anticipation of next week's closing of the transaction, please find attached the Wire Transfer Request Form and the Seller's W-9 Form." Gulf Coast Hospice completed and returned the

forms to LHC. On February 22, six days before the closing, LHC sent a draft of the closing statement for the purchase of Gulf Coast Hospice. The closing statement reflected the final purchase price of $1,775,000 and stated that $88,750 was being held in escrow. The next day, LHC sent the revised Asset Purchase Agreement that contained all of the terms of sale previously agreed to.

¶108. Despite LHC's ongoing actions, LHC ultimately refused to close the deal. As a result, although the agreed purchase price with LHC was $1,775,000, five months later, Gulf Coast Hospice was sold for only $500,000 to another purchaser.

¶109. "In the interest of justice, if, from the whole pleading, it can be seen that there is substance to the suit, and there is revealed enough to show equitable merits, the Court will go far towards entertaining the bill." *C. E. Frazier Constr. Co. v. Campbell Roofing & Metal Works, Inc.*, 373 So. 2d 1036, 1038 (Miss. 1979) (quoting *Dantone v. Dantone*, 205 Miss. 420, 38 So. 2d 908, 911 (Miss. 1949)). Here, genuine issues of material fact exist as to whether LHC's conduct caused Gulf Coast Hospice to change its position in reliance on that conduct and whether that conduct caused Gulf Coast Hospice to suffer detriment. Therefore, I would find that summary judgment was inappropriate.

¶110. The majority cites *King's Daughters & Sons Circle No. Two of Greenville v. Delta Reg'l Med. Ctr.*, 856 So. 2d 600, 607 (Miss. Ct. App. 2003), and its holding that the letter of intent in that case was a contract to make a contract and was not a final contract. However, *King's Daughters* involved a tortious interference claim, not a claim of estoppel. In addition, in that case, a critical factor in determining that a contract had not existed was that the

44

purchase price had not been determined. In this case the parties had determined the purchase price to be $1,775,000. Further, no evidence existed in that case that a party had all but taken over King's Daughters hospital or that the conduct of a party had caused the majority of King's Daughters' employees to resign.

¶111. The majority additionally cites ***Knight v. Sharif***, 875 F.2d 516 (5th Cir. 1989), a case involving two letters of intent for the sale of common stock. In that case, "[a]fter numerous efforts by the parties to negotiate a definitive agreement for the sale of the GAF stock, the . . . deadline expired without such an agreement for the sale of the stock having been executed by the parties." ***Id.*** at 518. This Court held that the letters of intent did not constitute an enforceable contract for the sale of the stock. ***Id.***

¶112. However, the instant case involves much more than the failed purchase of common stock. Gulf Coast Hospice presented evidence that LHC all but took over Gulf Coast Hospice after signing the letter of intent and created unrest within the business. LHC announced to Gulf Coast Hospice's employees, which management stated had been essential to the performance of the business, that LHC intended to acquire Gulf Coast Hospice. LHC then changed the hours, pay scales, and benefits of the employees, effective March 1. LHC acknowledged that its conduct had created unrest with the employees, yet it emailed Gulf Coast Hospice that LHC "remain[ed] committed to" Gulf Coast Hospice, its management, and its staff." As a result of LHC's changes, the majority of Gulf Coast Hospice's employees resigned. Moreover, while Gulf Coast Hospice's employees were resigning, LHC continued to make material changes to Gulf Coast Hospice's computer systems, accounts, and utility

45

services. Then, after LHC's changes caused Gulf Coast Hospice's employees to resign, LHC refused to close the transaction. As a result, instead of the price of $1,775,000, which LHC had offered, Gulf Coast Hospice sold for $500,000 five months later, a difference of $1,275,000. *In toto*, Gulf Coast Hospice presented satisfactory evidence to create a jury questions about whether LHC's actions, words, and performance consummated the contract and about whether the contract should be enforced through the doctrine of estoppel. As a result, summary judgment was inappropriate. I would find that a jury should determine the outcome of the case.

¶113. Viewing the evidence in the light most favorable to Gulf Coast Hospice, I would find that Gulf Coast Hospice presented sufficient evidence of the existence of genuine issues of material fact and would remand this case for a trial on the merits. Accordingly, I dissent.

**KITCHENS, P.J., JOINS THIS OPINION.**