REVISED 4/1/2025

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 28, 2025

Lyle W. Cayce
Clerk

No. 23-60483

North Mississippi Medical Center, Inc.,

*Plaintiff—Appellee*,

*versus*

Quartiz Technologies, *doing business as* Value Ascent, Inc.,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:23-CV-3

Before Higginbotham, Stewart, and Haynes, *Circuit Judges*.[*]

Patrick E. Higginbotham, *Circuit Judge*:[**]

In August 2018, North Mississippi Medical Center, Inc. and Quartiz Technologies entered into a three-year Masters Services Agreement, by which Quartiz would configure and manage a database for NMMC. In May 2022, NMMC requested a database backup, which Quartiz promptly delivered. Quartiz then sought a preliminary injunction to prevent its use by

---

[*] Haynes, Circuit Judge, concurring in judgement only.

[**] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

NMMC, which the district court denied. Quartiz timely appealed. Finding that the district court did not abuse its discretion in denying this relief, we AFFIRM.

## I.

In August 2018, North Mississippi Medical Center, Inc. ("NMMC") entered into a Master Services Agreement ("MSA" or "the Agreement") with Quartiz Technologies ("Quartiz") to configure and manage a PeopleSoft database for three years.[1] The MSA and subsequent Statements of Work ("SOW") transferred most of NMMC's data management needs to Quartiz.[2] Under a September 2019 SOW, NMMC and Quartiz agreed that Quartiz would migrate NMMC's database to the cloud, optimize database functionality, and manage the data for the duration of the contract term. Quartiz's performance was satisfactory for the duration of the contract.

In the spring of 2022, however, NMMC began taking steps to move the administration of its PeopleSoft database in-house. In March 2022, NMMC entered into an MSA with SpearMC Consulting, Inc. ("SpearMC"), a contractor in PeopleSoft data management services. NMMC and SpearMC executed their first SOW in May 2022, which specified that SpearMC would provide Amazon Web Services ("AWS") migration services and related PeopleSoft database management support.

---

[1] PeopleSoft is a software owned by Oracle Corporation that provides human resource management systems, financial management solutions, and other enterprise-related management functionalities to business entities.

[2] In relevant part, the MSA states: "1. **Deliverables, Work Products, Services.** Company shall provide services for purposes of maintenance, configuration, support, error corrections, installation, hosting, and other related services ('**Services**') of Business, Information, and Computer systems to the Client as described on one or more Statements of Work signed by Company and Client that reference this Agreement ('**SOW**' or '**Statement of Work**')." (emphasis in original). Though "Statement of Work" is not officially defined in the Agreement, it describes the services that Quartiz is to provide NMMC in further detail.

In May 2022, emails between Daphne Clement, NMMC's IT Business Manager and Eldo Mathew, Quartiz's co-founder and lead on the NMMC contract, show that NMMC requested a full database backup from Quartiz. Quartiz provided that backup five days later. NMMC and Quartiz dispute whether NMMC requested the database backup with the intent of sharing it with SpearMC or whether it was "solely for security and auditing," as Clement had represented in her May 2022 email. Regardless, neither party disputes that NMMC provided SpearMC with access to this database backup, and it has been using the database backup to complete its work on database migration for NMMC ever since.

In October 2022, NMMC made a formal request to Quartiz for the return of the PeopleSoft database. Quartiz responded, stating that it could not comply with the request because doing so would require Quartiz to provide NMMC with its intellectual property ("IP"), which Quartiz alleged it retained the rights to. Quartiz also addressed the May 2022 database backup, and ordered NMMC to "not use, copy, or redistribute any software components or custom programs" delivered along with the database backup, and to destroy any off-site copies, or copies used outside of the purposes of security and auditing.

In November 2022, Bruce Toppin, NMMC's chief legal officer replied, again requesting the return of NMMC's database; Toppin stated that failure to return the database would prompt NMMC to explore "all legal remedies, both civil and criminal." NMMC and Quartiz ultimately could not agree on an acceptable format for the return of the database. This lawsuit followed.

## II.

In December 2022, NMMC filed a complaint against Quartiz in the Circuit Court of Lee County, Mississippi, seeking a preliminary injunction and a permanent injunction requiring the immediate return of the data and database to NMMC, and money damages associated with maintaining

Quartiz as its vendor. Quartiz then filed a timely notice of removal to the Northern District of Mississippi, asserting diversity jurisdiction.

A month later, Quartiz filed its answer and counterclaim, alleging that NMMC, without right or authority, possessed and was using the May 2022 database backup that Quartiz had sent NMMC. Quartiz asserted six claims: (1) breach of contract; (2) conversion; (3) state law misappropriation of trade secrets under the Mississippi Uniform Trade Secrets Act; (4) federal law misappropriation of trade secrets under 18 U.S.C.A. § 1836; (5) per se negligence under the Mississippi Computer Crimes and Identity Theft Act; and (6) breach of duty of good faith and fair dealing.

Subsequently, Quartiz filed its motion for injunctive relief, seeking to affirmatively require NMMC to destroy the May 2022 database backup or to restrain NMMC from using or disseminating the database backup.[3] On August 9, 2023, the district court denied Quartiz's requests for injunctive relief.[4] Quartiz timely appeals.

## III.

The granting of a preliminary injunction is an "extraordinary and drastic remedy."[5] The decision to deny a preliminary injunction lies within the sound discretion of the district court and may be reversed on appeal only by a showing of abuse of discretion.[6] This Court "will not find an abuse of

---

[3] Quartiz also filed a separate motion seeking a Temporary Restraining Order..

[4] The district court also denied Quartiz's request for the Temporary Restraining Order.

[5] *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023), *cert. denied sub nom. Anibowei v. Mayorkas*, 144 S. Ct. 551 (2024) (citing *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984)).

[6] *Id.*

discretion unless the district court's factual findings are clearly erroneous or incorrect legal standards were applied."[7] A movant must show:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.[8]

The movant "bears the burden of persuasion on all four factors in order to be entitled to the extraordinary relief of a preliminary injunction."[9] Failure to establish any one of the four factors defeats the right to injunction.[10]

The district court's order denying Quartiz's request for injunctive relief assumes that "the third and fourth elements of the preliminary injunction standard are satisfied[.]" As NMMC does not contest this finding in its appellate brief, we focus our review on the first two elements of the preliminary injunction standard.[11]

## IV.

We hold that the district court did not abuse its discretion in denying the requested preliminary injunction, as Quartiz has not shown a substantial likelihood that it would succeed on the merits of its claims.

---

[7] *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) (quoting *Latvian Shipping Co. v. Baltic Shipping Co.*, 99 F.3d 690, 692 (5th Cir. 1996)).

[8] *Id.*

[9] *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 435 (5th Cir. 1981)

[10] *See Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990).

[11] *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). *See also Targeted Just., Inc. v. Garland*, No. 23-20342, 2024 WL 1007469, *3 (5th Cir. Mar. 8, 2024) ("The Plaintiffs have forfeited the remaining preliminary injunction factors by failing to brief them on appeal.").

**A.**

To show a likelihood of success on the merits for a preliminary injunction, Quartiz "is not required to prove [its] entitlement to summary judgement," but must at least present a *prima facie* case showing entitlement to relief.[12] "Though there is no particular degree of likelihood of success that is required in every case, the party seeking a preliminary injunction must establish at least some likelihood of success on the merits[.]"[13] To determine the likelihood of success on the merits, courts look to the standards provided by the applicable substantive law.[14]

**B.**

In denying Quartiz's request for a preliminary injunction, the district court correctly observed that "[w]hether NMMC has a license to possess and/or use the database backup is central to the resolution of Quartiz's counterclaims." If NMMC has a license to the database backup, then NMMC has consent to possess and use the IP at issue and Quartiz cannot prevail on its claims regarding breach of contract, conversion, misappropriation of alleged trade secrets, and per se negligence under the Mississippi Computer Crimes and Identity Theft Act.[15] We find that Quartiz has not shown a substantial likelihood that NMMC lacks a license to the database backup, and is unlikely to prevail on its breach of contract,

---

[12] *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

[13] *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017).

[14] *See Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011).

[15] MISS. CODE ANN. § 97-45-1-*et seq.* (West). In relevant part, the Mississippi Computer Crimes and Identity Theft Act identifies offenses against IP as "the intentional disclosure, use, copying, taking or accessing, without consent, of intellectual property." Quartiz's breach of contract, conversion, misappropriation of alleged trade secrets, and per se negligence claims are premised on the use of property without consent (via right or license).

conversion, misappropriation of alleged trade secrets, and per se negligence claims.

**1.**

Section 10 of the MSA is key to resolving Quartiz's claims against NMMC. Section 10 includes two relevant clauses:

> (1) "Company grants Client a perpetual, non-exclusive and non-transferable license to use, copy, reproduce, display, or distribute the Deliverable" (the "Perpetual License Clause"); and

> (2) "Each party will retain exclusive interest in and ownership of its Intellectual Property developed before the execution of this agreement or outside the scope of this agreement" (the "Exclusive Interest Clause").

Mississippi law governs any dispute related to the MSA.[16] The Supreme Court of Mississippi has established a three-tiered approach to contract interpretation.[17] First, the "four corners" test is applied, wherein a court must "read the contract as a whole, so as to give effect to all of its clauses."[18] Courts must "accept the plain meaning of a contract as the intent of the parties where no ambiguity exists."[19]

---

[16] The MSA states: "18. **Governing Law**. This Agreement will be deemed to have been made in, and shall be construed pursuant to the laws of the State of Mississippi, the United States without regard to conflicts of laws provisions thereof." (emphasis in original). Neither party disputes the applicability of Mississippi law to the MSA.

[17] *See Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (Miss. 2003)

[18] *Id.*

[19] *Epperson v. SOUTHBank*, 93 So. 3d 10, 16 (Miss. 2012).

Second, where a contract is found to be ambiguous, courts should apply discretionary canons of contract construction.[20] "A contract is ambiguous if it contains conflicting clauses when the contract is read as a whole."[21] Where there is ambiguity, judicial "resolution of any uncertainties will be [construed] against the drafter of the contract."[22] With ambiguous contracts, courts are permitted to apply "the notion that specific language controls over general inconsistent language in a contract."[23] Third, if ambiguity continues, courts can then consider extrinsic or parol evidence.[24] This includes "course of performance evidence."[25]

**2.**

Though both NMMC and Quartiz argue that Section 10 of the MSA is unambiguous, the two parties disagree on the provision's meaning, particularly the interaction between the Perpetual License and Exclusive Interest Clauses. NMMC argues that the two clauses—read together—give NMMC a perpetual license for the IP embedded in the database backup, while restricting ownership of the IP to Quartiz. Quartiz rejects this interpretation, asserting that NMMC's reading gives short shrift to the meaning of "exclusive interest."

Instead, Quartiz relies exclusively on the Exclusive Interest Clause of Section 10 to argue that the MSA is unambiguous and that NMMC does not

---

[20] *Royer Homes of Miss.*, 857 So. 2d at 753.

[21] *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 518 (Miss. 2018).

[22] *Dalton v. Cellular S., Inc.*, 20 So. 3d 1227, 1232 (Miss. 2009).

[23] *Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So. 2d 1077, 1085 (Miss. 2000). *See also Union Planters Bank, Nat. Ass'n v. Rogers*, 912 So. 2d 116, 120 (Miss. 2005); *Harris v. Harris*, 988 So. 2d 376, 379 (Miss. 2008); *Bowman v. Bowman*, 332 So. 3d 317, 323 (Miss. Ct. App. 2021).

[24] *Royer Homes of Miss.*, 857 So. 2d at 753.

[25] *Rosenfelt*, 262 So. 3d at 518.

have a license to the IP embedded in the database backup at issue. Quartiz emphasizes the plain language meaning of "exclusive" and "interest", asserting that the clause requires finding that NMMC does not have a license to the IP at issue.[26]

But under Mississippi case law, contracts must be read as a whole "to give effect to all of its clauses."[27] In other words, "[p]articular words should not control; rather, the entire instrument should be examined."[28] While Quartiz's interpretation of the Exclusive Interest Clause—in isolation—may have purchase, Quartiz has not shown how this clause can be reasonably read with the Perpetual License Clause that immediately precedes it, which states that NMMC has "a perpetual, non-exclusive and non-transferable license to use . . . the Deliverable."

To support its interpretation, Quartiz raises two additional arguments. First, Quartiz asserts that the Exclusive Interest Clause is a more specific provision that controls and modifies the Perpetual License Clause under Mississippi law.[29] Quartiz cites to language in sample licensing contracts to illustrate that comparable exclusive interest clauses are construed as specific provisions. Second, Quartiz argues that NMMC admitted that no such license existed.

---

[26] Quartiz asserts: "If NMMC possesses an interest in all intellectual property belonging to Quartiz contained in the PeopleSoft database (and the database backup provided to NMMC), then Quartiz cannot be said to have an exclusive interest in any of the intellectual property contained within the PeopleSoft database. This cannot be reconciled with the plain language of the Agreement which provides that Quartiz retains exclusive interest to intellectual property developed before the Agreement or outside the scope of the Agreement."

[27] *Royer Homes of Miss.*, 857 So. 2d at 752.

[28] *Epperson*, 93 So. 3d at 18 (cleaned up).

[29] *See id.* ("[S]pecific provisions control over general provisions[.]"). *See also* RESTATEMENT (FIRST) OF CONTRACTS § 236(c) (1932).

Neither argument is convincing. First, as NMMC points out, the sample contract provisions that Quartiz cites to in its brief undercut Quartiz's argument: the general provision in those agreements is the licensor's reservation of rights (here, the Exclusive Interest Clause), and it is modified by the more specific carve-out provision granting a license (here, the Perpetual License Clause).[30] Quartiz argues that the MSA provision differs from the sample agreements it cites in that it lacks explicit exemption language. This distinction, however, creates a colorable argument that the Exclusive Interest Clause and the Perpetual License Clause are *both* general provisions that create inconsistency in meaning when read together. Under the notion that specific language controls over general inconsistent language in a contract, Quartiz's interpretation does not hold. Moreover, given the ambiguity in meaning, Mississippi law would resolve the provision in favor of the party who did *not* draft the contract; here, NMMC.[31]

Second, Quartiz's record citations take NMMC's statements out of context. Though NMMC acknowledged the Exclusive Interest Clause of the MSA, NMMC did not say that the clause controlled over the "perpetual license" clause.

The district court—without deciding the licensing issue—found that Quartiz had not demonstrated a substantial likelihood of success on the merits on these grounds.[32] As Quartiz has yet to offer an interpretation that

---

[30] The sample licensing agreements that Quartiz cites to includes: "**Except for the licenses express granted to Licensee in this Agreement, Licensee acknowledges** that all right title, and interest in and to the Work" [*sic*]; "Licensee acknowledges that Licensor owns and retains all right, title, and interest in and to the Licensed Works, **subject to the license granted in Section 1.1.**" (emphasis in original).

[31] *Miss. Transp. Comm'n*, 753 So. 2d 1077 at 1085 (applying both the canon of contract construction that ambiguities in a contract are to be construed against the party who drafted the contract, and the doctrine that specific provisions override more general language to interpret an ambiguous contract).

[32] The district court stated: "While [the exclusive interest] clause certainly reserves each party's interest and ownership rights in their respective intellectual

"give[s] effect" to both the Exclusive Interest Clause and Perpetual License Clause of the MSA provision on appeal,[33] we agree.

**3.**

Quartiz further argues that any license granted to NMMC under the MSA does not include the right to possess the database backup. Quartiz asserts that the term "Deliverable" is not defined in the MSA, so course of performance evidence can be used to give meaning to the term, and that such evidence reveals that "Deliverable" does not include backups of the database. Specifically, Quartiz points to a September 2019 SOW, which gives Quartiz the responsibility of maintaining database backups, and NMMC's May 2022 request from Quartiz for a database backup to establish Quartiz's designated responsibility of database maintenance.

Quartiz is mistaken. The term "Deliverable" is defined to be synonymous with "Work Product" in the MSA.[34] Though "Work Product" is undefined in the MSA, its ordinary meaning includes: "data and products produced . . . including but not limited to, . . . software, databases, . . . computer programs . . . to the extent provided by law."[35] The plain meaning of "Work Product"—and by association "Deliverable"—in this MSA would encompass the database backup at issue.

_____

properties, Quartiz has not satisfactorily shown how it negates the perpetual license clause that immediately precedes it. … It is enough that Quartiz has not demonstrated a 'substantial' likelihood of success on the merits to be entitled to a preliminary injunction or temporary restraining order."

[33] *Royer Homes of Miss.*, 857 So 2d. at 752.

[34] "Company shall perform Services in a prompt manner and have **Work Products** ("**Deliverable**") ready as specified in the SOW." (emphasis in original). Upon further investigation, the term "Deliverable" lacks an applicable dictionary definition in contemporaneous dictionaries.

[35] Rustad, Michael, 1 COMPUTER CONTRACTS § 1.08-1.

Course of performance between the two parties further supports this definition of "Deliverable" in the MSA: though the September 2019 SOW gave Quartiz the responsibility of database maintenance, Quartiz willingly delivered a database backup to NMMC in May 2022 at NMMC's request. Quartiz argues that this database backup cannot be considered a "Deliverable" because it provided the database solely to allow NMMC to meet its security and auditing obligations. As the district court correctly noted, however, Quartiz has failed to identify a contractual provision that limits NMMC's use of the database backup to those purposes. Without this, Quartiz has not sufficiently shown that the database backup cannot be considered a "Deliverable" under the Agreement.

Lastly, Quartiz argues that the MSA does not provide a license to the source code of the database at issue, drawing from industry standards regarding software licenses. This argument, however, is inapposite because the MSA does not purport to grant a software license. As NMMC noted, NMMC has no need for a license from Quartiz for the PeopleSoft software, as NMMC licensed the program independently from Oracle. Instead, NMMC correctly alleges that the MSA grants a license for any changes that Quartiz made to the PeopleSoft database during their three-year contract.

## C.

Quartiz's claim for breach of the duty of good faith and fair dealing exists independently of the resolution of the licensing issue. Quartiz has similarly failed to establish likelihood of success on the merits on this claim.

Mississippi courts have held that "all contracts contain an implied covenant of good faith and fair dealing in performance and enforcement."[36] "Good faith is the faithfulness of an agreed purpose between two parties, a

---

[36] *Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 744 (Miss. 2019) (citation omitted).

purpose which is consistent with justified expectations of the other party."[37] Bad faith, by contrast, "requires a showing of more than bad judgement or negligence; rather, [it] implies some conscious wrongdoing because of dishonest purpose or moral obliquity."[38] Mississippi courts have found that "abusive, aberrant, intimidating, harassing behavior" that has made "life a living hell" constitutes a breach of good faith and fair dealing.[39]

Quartiz argues that NMMC has violated the duty of good faith and fair dealing in three ways: (1) NMMC has continued to demand that Quartiz return its database backups; (2) NMMC has threatened to refer Quartiz to the U.S. Attorney's office and the Federal Bureau of Investigation ("FBI"); and (3) NMMC has used the May 2022 database backup it received from Quartiz for purposes beyond its original representations.

None of NMMC's alleged actions, however, rise to the level of bad faith under Mississippi law. First, NMMC's requests to Quartiz for database backups do not arise out of "conscious wrongdoing," but instead out of NMMC's justified expectations of the MSA. Second, while NMMC stated that it would "look to explore all legal remedies, both civil and criminal," including referrals to the U.S. Attorney's office and the FBI, this does not rise to the level of a threat, and certainly does not constitute "abusive, aberrant, intimidating, harassing behavior."[40] Third, though NMMC has used the May 2022 database backup for purposes other than auditing and security, Quartiz has failed to point to a contractual provision in the MSA that limits NMMC's use of the database backup.[41] Quartiz has failed to

---

[37] *Id.*

[38] *Id.* (cleaned up).

[39] *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992).

[40] *See id.*

[41] *See supra*, Sections IV(A)-(B).

persuade with a substantial likelihood that it would succeed on the merits of this claim.

## V.

Quartiz has also failed to establish that there is a substantial threat that Quartiz would suffer irreparable injury if the injunction were not granted.

### A.

To satisfy the second element of the preliminary injunction standard, Quartiz must "demonstrate that if the district court denied the grant of a preliminary injunction, irreparable harm would result."[42] "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages."[43] "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm."[44]

### B.

Quartiz argues that the denial of the preliminary injunction would result in irreparable harm because the disclosure of IP to third parties could substantially harm Quartiz's relationship with the contractors who co-developed the IP at issue, and the disclosure of IP to a direct competitor would be an existential threat to Quartiz's existence.

Here, however, monetary damages are available. The district court, in denying injunctive relief, noted that the evidentiary hearing confirmed that "money damages could be calculated relatively easily." And Quartiz conceded as such. Furthermore, Quartiz's claims that monetary damages are inadequate are undercut by the fact that third party contractors have access

---

[42] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

[43] *Id.*

[44] *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (citation omitted).

to the IP at issue and could share the IP with others at any time. Quartiz admitted that it does not have confidentiality agreements with these third parties, and that these third parties have used the IP at issue in at least "one or two instances" for other clients.

For these reasons, the district court did not abuse its discretion in finding that Quartiz failed to establish that there is a substantial threat that it would suffer irreparable harm if the injunction were not granted.

## VI.

Quartiz has not—at this juncture—provided a sufficient showing that it is substantially likely to succeed on the merits and establish that there is a substantial threat that it would suffer irreparable harm if the injunction were not granted. We hold that the district court did not abuse its discretion in denying the preliminary injunction and AFFIRM the district court's order.